No. 2013-1575

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

———————————

BUYSAFE, INC.,
Plaintiff-Appellant,

v.

GOOGLE, INC.,
Defendant-Appellee.

———————————

Appeal from the United States District Court for the District of Delaware
in case no. 11-CV-1282, Judge Leonard P. Stark.

———————————

## BRIEF FOR PLAINTIFF-APPELLANT
## BUYSAFE, INC.

———————————

Stephen M. Hankins
Alison L. Maddeford
SCHIFF HARDIN LLP
One Market, Spear Street Tower
Thirty-Second Floor
San Francisco, CA 94105
(415) 901-8700

Donald E. Stout, Esq.
ANTONELLI, TERRY, STOUT &
KRAUS, LLP
Suite 1800
1300 North Seventeenth Street
Arlington, Virginia 22209
(703) 312-6650

Brian D. Siff
James E. Hanft
SCHIFF HARDIN LLP
666 Fifth Avenue
Suite 1700
New York, NY 10103
(212) 753-5000

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant buySAFE, Inc., certifies the following:

1.      The full name of every party or *amicus* represented by me is:

buySAFE, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Not applicable.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

buySAFE, Inc. does not have a parent corporation.  No publicly held companies own 10% or more of the stock in buySAFE, Inc.

4.      The names of all law firms and the partners or associates that appeared for the party or *amicus* now represented by me in the trial court or agency or are expected to appear in this court are:

SCHIFF HARDIN LLP
Stephen M. Hankins
Brian D. Siff
James E. Hanft
Alison L. Maddeford

ANTONELLI, TERRY, STOUT & KRAUS, LLP
Donald E. Stout

FARNAN, LLP
Joseph F. Farnan
Brian E. Farnan

ORRICK, HERRINGTON & SUTCLIFFE, LLP
Paul Gupta
Clifford R. Michel
W. Benjamin Tabler III
Garrett G. Rasmussen

Dated:  October 21, 2013                          Respectfully submitted,


*/s/ Stephen M. Hankins*
Stephen M. Hankins

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ...................................................................1

JURISDICTIONAL STATEMENT .....................................................................2

STATEMENT OF THE ISSUE..............................................................................3

STATEMENT OF THE CASE................................................................................4

STATEMENT OF THE FACTS .............................................................................5

I.    THE PATENTED INVENTION...................................................................5

    A.    The '019 Patent ....................................................................................5

    B.    The '019 Patent File History ..............................................................8

II.   LOWER COURT PROCEEDINGS..........................................................10

SUMMARY OF THE ARGUMENT ..................................................................11

ARGUMENT ........................................................................................................13

I.    STANDARD OF REVIEW .......................................................................13

II.   THE '019 PATENT CLAIMS PATENT-ELIGIBLE SUBJECT
     MATTER UNDER 35 U.S.C. § 101 .........................................................13

    A.    The '019 Claims Are Patent-Eligible Under Supreme Court
        Precedent ............................................................................................14

        1.    Each Claim Must Be Considered as a Whole and as
             Written—Not After Being Stripped to the Abstract Idea ........14

        2.    The '019 Patent Claims Describe Significantly More
             Than an Abstract Idea ..............................................................16

    B.    The '019 Patent Claims Are Directed to Patent-Eligible
        Material Under the Reasoning of Recent Federal Circuit Cases .......22

        1.    The Asserted Claims of the '019 Patent Are Patent-
             Eligible Under the Analysis Set Forth in the Opinion
             Authored by Judge Lourie in *CLS Bank* ..................................22

        2.    The Asserted Claims of the '019 Patent Are Patent-
             Eligible Under the Analyses Articulated in *Ultramercial*
             and in the Opinion Authored by Judge Rader in *CLS
             Bank*........................................................................................24

i

# TABLE OF CONTENTS
## (Continued)

**Page**

      3.     The Asserted Claims of the '019 Patent Are Patent-Eligible Under the Analyses Contained in the Opinions Authored by Judge Moore, Judge Newman and Judge Linn in *CLS Bank* ................................................................... 27

C.     The Claims of the '019 Patent Also Satisfy the Machine-Or-Transformation Test .......................................................................... 29

CONCLUSION ...................................................................................................... 33

# TABLE OF AUTHORITES

<u>Page</u>

## Cases

*Bilski v. Kappos*,
130 S. Ct. 3218 (2010)........................................................................... passim

*Diamond v. Chakrabarty*,
447 U.S. 303 (1980)......................................................................................13

*Diamond v. Diehr*,
450 U.S. 175 (1981)................................................................... 15, 17, 20, 21

*In re Alappat*,
33 F.3d 1526 (Fed.Cir.1994) ................................................................ 28, 30

*In re Bilski*,
545 F.3d 943(Fed. Cir. 2008) .....................................................................13

*Mayo Collaborative Services v. Prometheus Labs., Inc.*,
132 S. Ct. 1289 (2012)........................................................................ passim

*Research Corp. Tech., Inc. v. Microsoft Corp.*,
627 F.3d 859 (Fed. Cir. 2010) ............................................................. 22, 32

*SiRF Tech., Inc. v. Int'l Trade Comm'n*,
601 F.3d 1319 (Fed. Cir. 2010) ..................................................................29

## Statutory Authorities

28 U.S.C. § 1295(a)(1)..................................................................................2

28 U.S.C. § 1331 ...........................................................................................2

28 U.S.C. § 1338(a) ......................................................................................2

35 U.S.C. § 101 .................................................................................. passim

35 U.S.C. §102...............................................................................................8

35 U.S.C. §103...............................................................................................8

Fed. R. Civ. P. 12(c)......................................................................................4

## STATEMENT OF RELATED CASES

No appeal from this civil action was previously before this Court or any other appellate court.  There are no cases known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 and § 1338(a).

The district court entered final judgment on August 19, 2013.  (A-1.)  buySAFE, Inc. ("buySAFE") filed a timely Notice of Appeal on August 20, 2013.

This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUE

Are Claims 1, 14, 39, and 44 of U.S. Patent No. 7,644,019, which are drawn to specific E-commerce computer-application based methods and machine-readable media, and which require a specific machine to perform the recited steps, patent-eligible subject matter under 35 U.S.C. § 101?

## STATEMENT OF THE CASE

This is a patent infringement case involving buySAFE's U.S. Patent No. 7,644,019 ("the '019 Patent") which covers specific computer-application based methods and media for providing a transaction performance guaranty service for online commercial transactions.  buySAFE asserts that Google, Inc. ("Google") infringed and continues to infringe the '019 Patent.

After Google moved for judgment on the pleadings under Fed. R. Civ. P. 12(c), the district court found the '019 Patent not directed to patent-eligible subject matter.

STATEMENT OF THE FACTS

## I.    THE PATENTED INVENTION

### A.    The '019 Patent

On April 21, 2003, buySAFE filed an application for its new invention.  (A-13.)  The Patent issued on January 5, 2010.  (*Id.*)

The invention in the '019 Patent targets a specific problem in electronic commerce ("E-commerce"):  risks of non-performance in transactions typically between anonymous parties over the Internet.  (A-37, col. 1, ll. 6-10, 22-35.)  Unlike brick and mortar sales, a consumer shopping on the Internet faces certain concerns, including the risk of fraudulent transactions, failures to make payment, and failures to ship after payment is made.  (*Id.*, col. 1, ll. 22-35.)  Prior solutions to this problem included the use of escrow or a collateral in the form of performance bonds.  (*Id.*, col. 1, ll. 36-62.)  But these solutions are not particularly desirable.  (*Id.*)  For example, the escrow solution requires a delay in the middle of the transaction, which is undesirable to and expensive for participants in E-commerce who want transactions to occur quickly and cost-effectively.  (*Id.*)  The claimed invention provides an alternative method of solving this E-commerce problem.  (*Id.*, col. 1, ll. 6-10.)

The asserted claims of the '019 Patent are claims 1, 14, 39, and 44.  (A-5.)  Claims 1 and 39 are independent claims.  (*Id.*)  Claim 1 is a method claim:

5

A method, comprising:

receiving, by at least one computer application program running on a computer of a safe transaction service provider, a request from a first party for obtaining a transaction performance guaranty service with respect to an online commercial transaction following closing of the online commercial transaction;

processing, by at least one computer application program running on the safe transaction service provider computer, the request by underwriting the first party in order to provide the transaction performance guaranty service to the first party,

wherein the computer of the safe transaction service provider offers, via a computer network, the transaction performance guaranty service that binds a transaction performance guaranty to the online commercial transaction involving the first party to guaranty the performance of the first party following closing of the online commercial transaction.

(A-45, Claim 1.)  Claim 39 is similar to Claim 1 and covers a machine readable

medium:

A machine readable medium, encoded with instructions, that when executed by a machine, result in the following:

receiving, by at least one computer application running on a computer of a safe transaction service provider, a request from a first party for obtaining a transaction performance guaranty service with respect to an online commercial transaction;

processing, by at least one computer application running on the safe transaction service provider computer, the request by underwriting the first party in order to provide the transaction performance guaranty service to the first party,

wherein the safe transaction service provider computer offers, via computer network, the transaction

performance guaranty service that binds a transaction
performance guaranty to the online commercial
transaction involving the first party to guarantee the
performance of the first party in response to a closing of
the online commercial transaction.

(A-46, Claim 39.)

The asserted claims of the '019 Patent cover the provision of a transaction

performance guaranty service by a physical computer system in an E-commerce

environment related to an online commercial transaction. (A-37.) Figure 8 of the

'019 Patent depicts an exemplary internal structure of the safe transaction service

provider:



(A-22.)  The method of providing a transaction performance guaranty includes the following steps:  a computer application running on the service provider's computer which receives electronically a request from a party for a transaction performance guaranty; a computer application running on the service provider's computer processes the request by underwriting the transaction; the service provider offers, over a computer network like the Internet, the transaction performance guaranty; and the service electronically binds a transaction performance guaranty to the online commercial transaction.  (*See* A-45, Claim 1.) Notably, the automated binding step occurs only after the closing of the online commercial transaction.  (*Id*.)  The timing of this binding allows individual guaranties to be attached to an actual online transaction that has already occurred and thus, after the details of the transaction—such as price, quantity and product— have been finalized.  (*See, e.g*., A-42, col. 11, l. 58-col. 12, l. 3 (discussing one way to transfer data with details of a specific online transaction.))

### B.    The '019 Patent File History

During prosecution of the application, the Examiner rejected all of the pending Claims under 35 U.S.C. §102 and §103 as being unpatentable over the prior art.  (*See* A-443-453; A-568-578; A-657-A-663.)  The Applicant amended the pending Claims to add temporal limitations and to clarify the computer implementation and limitations.  (*See, e.g*., A-531-A-550; A-617-A-631; A-670-A-

684.)  In particular, Claim 1 was amended to recite that the transaction performance guaranty binds "following closing of the online commercial transaction," and to include specific limitations that the actions are being performed by "at least one computer application program running on" a computer and to clarify that the service is offered "via computer network."  (A-531; A-617; A-670.)  Claim 39 was amended to recite that the transaction performance guaranty binds "in response to a closing of the online commercial transaction" and to include specific limitations that the method is being performed by "at least one computer application program running on a computer of a safe transaction service provider," and to clarify that the service is offered "via computer network."  (A-550; A-630-A-631; A-684.)

The Examiner found that the prior art failed "to teach or suggest the claimed invention pertaining to transaction performance guaranties offered and binding to an online transaction following closing of the online transaction."  (A-703-A-704.) Further, the Examiner stated that the prior art teaching, of binding prior to closing of the transaction, contradicted the limitations set forth in the claims.  (*Id*.)

Thus, the United States Patent and Trademark Office ("USPTO") understood that the claims specifically required implementation through a computer network system, and found the temporal limitation of the claims to be an inventive limitation that distinguished the claimed invention from the prior art.

## II.    LOWER COURT PROCEEDINGS

On December 22, 2011, buySAFE filed an action against Google, Inc. ("Google"), alleging that Google's "Google Trusted Stores" program infringes the '019 Patent.  (A-4.)

Google moved for judgment on the pleadings, arguing that asserted Claims 1, 14, 39, and 44 of the '019 Patent are directed to non-patent-eligible subject matter, and thus, are invalid under 35 U.S.C. §101.  (A-5-A-6.)

On July 29, 2013, the Court issued a Memorandum and Order finding Claims 1, 14, 39, and 44 of the '019 Patent are not eligible for patent protection under section 101.  (A-12; A-2.)  The Court entered final judgment on August 19, 2013.  (A-1.)  buySAFE accordingly filed this Appeal.

## SUMMARY OF THE ARGUMENT

The Claims of the '019 Patent include specific transactional, temporal, and computer process limitations that disclose a specific application of an inventive idea. The Claims describe providing transaction performance guaranties in a specified computer network where the transaction performance guaranty binds only after closing an online commercial transaction. Accordingly, the Claims are patent-eligible under 35 U.S.C. § 101 because they "do significantly more than simply describe" an abstract concept.

In determining whether a claim is patent-eligible, the Supreme Court considers whether the claim is so broad as to preempt an abstract idea. Here, the '019 Patent Claims do not preempt any abstract idea. Instead, the Claims contain limitations requiring: (1) an online commercial transaction; (2) the specific use of a computer, a computer application and the related infrastructure that processes requests for a transaction performance guaranty and the underwriting of the guaranty; and (3) the binding of the transaction performance guaranty service only after the online commercial transaction closes. Taken together, these limitations provide an inventive concept separate and apart from any abstract idea—for example, the generalized idea of a transaction performance guaranty. They meaningfully limit the abstract concept of a transaction performance guaranty to an actual and concrete application of an inventive idea of offering transaction

performance guaranties in an E-commerce environment in the specific manner claimed.

Indeed, the '019 Patent discloses not simply a general computer, but a computer programmed to perform specific algorithms, in a specified sequence of steps, and at specified times, resulting in a highly specialized machine. The Claims use computers to transform a computer-based environment into a safe environment for online shopping. The USPTO specifically determined that this idea, as limited, was not disclosed by the prior art, was not obvious, and was patent-eligible.

The infrastructure disclosed for this invention is clearly not abstract. buySAFE respectfully requests that this Court reverse the decision of the district court.

## ARGUMENT

### I.    STANDARD OF REVIEW

This Court reviews a determination of whether the claims of a patent are

drawn to patent-eligible subject matter under section 101 *de novo*.  *In re Bilski*, 545

F.3d 943, 951 (Fed. Cir. 2008), *aff'd on other grounds by Bilski v. Kappos*, 130 S.

Ct. 3218 (2010).  Similarly, this Court reviews issues of statutory interpretation, to

the extent they exist, *de novo*.  *Id*.

### II.    THE '019 PATENT CLAIMS PATENT-ELIGIBLE SUBJECT MATTER UNDER 35 U.S.C. § 101

Section 101 of the Patent Act provides:

> Whoever invents or discovers any new and useful
> process, machine, manufacture, or composition of matter,
> or any new and useful improvement thereof, may obtain
> a patent therefor, subject to the conditions and
> requirements of this title.

35 U.S.C. § 101.  Thus, the statute sets forth four broadly stated categories of

patent-eligible subject matter:  processes, machines, manufactures, and

compositions of matter.  "In choosing such expansive terms ... modified by the

comprehensive 'any,' Congress plainly contemplated that the patent laws would be

given wide scope."  *Bilski v. Kappos*, 130 S. Ct. 3218, 3225 (2010) (internal

quotations omitted); *see also Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980)

("Congress intended statutory subject matter to 'include anything under the sun

that is made by man'").

There are three recognized exceptions to section 101's broad patent-eligibility principles:  "laws of nature, physical phenomena, and abstract ideas." *Bilski*, 130 S. Ct. at 3225 (quotations omitted).  But "[b]road inclusivity is the Congressional goal of § 101, not a flaw."  *Ultramercial, Inc. v. Hulu LLC*, 722 F.3d 1335, 1342 (Fed. Cir. 2013).  The Supreme Court has rejected the proposition that business methods are categorically abstract and ineligible for patent protection. *Bilski*, 130 S. Ct. at 3228-29.  "[T]he Supreme Court has cautioned that, to avoid improper restraints on statutory language, acknowledged exceptions thereto must be rare."  *Ultramercial*, 722 F.3d at 1342.  This inquiry under section 101 is separate and apart from whether the claimed invention is novel under Section 102, nonobvious under Section 103, and particularly described under Section 112.  *See Bilski,* 130 S. Ct. at 3225.

There is no dispute that the claims of the '019 Patent are processes as defined by 35 U.S.C. § 101.  The only question before the district court was whether the Claims fall within the "abstract ideas" exception.  (A-6.)

### A.    The '019 Claims Are Patent-Eligible Under Supreme Court Precedent

#### 1.    Each Claim Must Be Considered as a Whole and as Written—Not After Being Stripped to the Abstract Idea

The Supreme Court has provided guidance for determining the eligibility of patent claims.  First, the "claims must be considered as a whole."  *Diamond v.*

*Diehr*, 450 U.S. 175, 188 (1981).  It is improper to strip away claim limitations to lay bare an abstract idea and then determine whether that idea is patent-eligible. Under such an analysis, patent eligibility would almost nowhere be found because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas."  *Mayo Collaborative Services v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012).  Here, the district court violated this simple principle by hyper-distilling the claims to the overly-simplistic subject matter of "general concept of performance guaranties."

At Google's invitation, the district court stripped away the Claim limitations to an abstract idea, and only after that found that the Claims described non-patentable subject matter.  (A-11-A-12 ("the '019 patent is directed to an abstract—and, therefore, unpatentable—process of underwriting commercial transactions by a third party to guarantee performance."))  The lower court reasoned that "[a]llowing [buySAFE] to patent the general concept of performance guaranties would effectively grant a monopoly over an abstract idea," and thus, granted Google's motion.  (A-12.)  But that is not what the '019 Patent claims and, therefore, such an analysis is impermissible.  It is improper to assume that the claim does not contain transactional, computer process or temporal limitations because that is not what is, in fact, claimed in the '019 Patent.  By ignoring the

additional limitations in the asserted claims, the district court made its determination of patent eligibility based on Claims that do not exist.

### 2.    The '019 Patent Claims Describe Significantly More Than an Abstract Idea

In determining whether a claim meets the requirements of section 101, the Court must decide whether the claims at issue "do significantly more than simply describe" an abstract concept. *See Prometheus*, 132 S. Ct. at 1297. The relevant question is: "do the patent claims add *enough* to their statements of [the abstract concept] to allow the processes they describe to qualify as patent-eligible processes that *apply* [abstract concepts]?" *Id*. Here, the answer is yes.

In the '019 Patent, the claimed subject matter targets a specific problem: increasing trust in an online environment where typically anonymous parties are exposed to certain risks, many unique to the Internet-based environment. The '019 Patent provides a specific and unique solution: transaction performance guaranties provided over a network that bind after the online commercial transaction closes.

It is not accurate to characterize the invention of the '019 Patent as merely the abstract concept of a "transaction performance guaranty." The Claims do not stop at describing a transaction performance guaranty. Instead, they include additional limitations that describe the method and medium for a specific application of the abstract concept of transaction performance guaranty. *See Prometheus*, 132 S. Ct. at 1297. For example, Claim 1 of the '019 Patent contains

16

limitations requiring an online commercial transaction over a computer network; receiving, by a computer application running on the computer of a safe transaction service provider, a request for a transaction performance guarantee; processing, by the computer application, that request by underwriting the online commercial transaction; and the binding of the transaction performance guaranty service at a specific time, *i.e.*, after the online commercial transaction closes. (A-45.)

The Supreme Court recently considered section 101 in *Prometheus*, where it found that the claims-at-issue were not "sufficient to transform the nature of the claim." *Prometheus*, 132 S. Ct. at 1298. There, the claims specified the steps of administering a specific drug to a patient and determining the resulting metabolite level, and included a "wherein" clause that specified the relevant natural laws. *Id.* at 1296-97. The Supreme Court found that neither the administering step nor the determining step was sufficient to transform the nature of the claims. *Id.* at 1297-98. The steps were well-known and routinely-used. *Id.* at 1297-98. Further, the order of the combination added nothing to the laws of nature, because anyone who wanted to make use of these laws had to follow the steps in the precise order set forth in the *Prometheus* claims. *Id.* at 1298. "A new combination of steps may be patentable even though all of the constituents of the combination were well known and in common use before the combination was made." *Id.* (*quoting Diehr*, 450

17

U.S. at 188).  But that was not the case in *Prometheus*, where the claims there

merely described the law of nature.

In contrast, the '019 Patent Claims require a specific combination of

computer components, including server systems executing the online commercial

transaction.  The processing of the "underwriting" an online commercial

transaction limitation requires the identification of and communication between

parties through a network—such as the Internet—with all of its attendant security,

verifications and protocols.  (*See, e.g.*, A-42, col. 11, ll. 4-16; A-44, col. 15, ll. 16-

30.)  These limitations as claimed, in fact, *cannot* be performed absent a

computer—for example, by telephone or with pen and paper—because they require

server systems executing the online commercial transaction, exchanging data

regarding the online commercial transaction, and confirming that the party

requesting the underwriting is a legitimate party that may be underwritten.  (*See

id.*; A-45, Claim 1.)  These limitations transform the nature of the Claims from an

abstract idea to a specific application of the idea.

An important consideration in determining whether a claim is more than an

abstract idea is whether one can perform the abstract idea without infringing the

claims.  *See CLS Bank Int'l v. Alice Corporation Pty. Ltd.*, 717 F.3d 1269, 1277

(Fed. Cir. 2013) (opinion of Lourie, J.) ("the Supreme Court's foundational § 101

jurisprudence … turns primarily on the practical likelihood of a claim preempting a

fundamental concept"); *id*. at 1300 (opinion of Rader, J.) ("Pre-emption is only a subject matter eligibility problem when a claim preempts all practical uses of an abstract idea").  The asserted Claims do not simply describe a well-known abstract concept, but rather claim and are limited to a specific way of providing by a computer application transaction performance guaranties for online commercial transactions.  Others are free to perform other practical uses of the transaction performance guaranty idea.

For example, the Claims contain the temporal limitation that the guaranty binds after the transaction closes.  (*See* A-45, Claim 1.)  This temporal limitation provides an inventive concept significantly different from the prior art, amounting to a significant human contribution, in the application of a "transaction performance guaranty."  The Examiner of the '019 Patent allowed the Claims to issue in part because the prior art failed to teach or suggest transaction performance guaranties that bind to an online transaction following closing of the online transaction. (A-703-A-704.)  This specific limitation precludes the possibility of preemption of the idea of all transaction performance guaranties, because practicing what was known in the prior art—*i.e.*, binding at any time before the transaction closes—would not meet this limitation of the Claims.  *Compare with Bilski*, 130 S. Ct. 3218 (finding ineligible a patent on risk hedging because the claims would preempt use in all fields) *and Prometheus*, 132 S. Ct. 1289 (finding

claims would preempt use of natural laws because the claimed steps were well understood, routine and conventional activity and necessary to make use of the law).

Likewise, the Claims do not preempt applications of the idea of the transaction performance guaranty when the performance guaranty is not connected with online transactions and in the order prescribed by the Claims. Nor do the Claims preempt applications where the computer process limitations are not performed. Thus, there is no preemption of any abstract concept.

This is not a case where the additional limitations provide "insignificant post-solution activity." *See Diehr*, 450 U.S. at 191-92. Rather, the limitations narrow the scope of the Claims in such a manner to set the Claims apart from the abstract idea of performance guaranties and limit the Claims to a specific, computer-based and time-restricted application of the performance guaranties, similar to the claims in *Diehr*.

In *Diehr*, the claimed invention described a process for molding raw, uncured synthetic rubber into cured precision products. *Id*. at 177. The claimed process constantly measured the internal temperature of the molds and fed the information to a computer to recalculate the cure time, and the computer signaled when to open the mold press. *Id*. at 178-79. Because the claims did not seek to preempt the use of that equation, but only to foreclose "the use of that equation in

conjunction with all of the other steps in [the] claimed process," the Supreme

Court found the claims patent-eligible *Id.* at 187.

As in *Diehr*, the '019 Patent Claims do not seek to preempt the use of

transaction performance guaranties, but only the use of them in conjunction with

the precise steps and temporal limitation in the Claims.  As in *Diehr*, the temporal

limitation of the Claims was determined to be inventive and not in the prior art,

and as such cannot be considered non-substantive.  (A-703-A-704.)  As a

limitation found by the USPTO to be missing from the prior art, this temporal

limitation cannot be routine, well-understood or conventional.  This limitation is

not tangential since the timing is important to practicing the invention and ties the

Claims to a specific application.  Indeed, by binding only after the close of the

online commercial transaction, the invention allows individual guaranties to be

attached to an actual online transaction after the details of the specific online

transaction—such as price, quantity and product—are known.  (*See, e.g.*, A-42,

col. 11, l. 58-col. 12, l. 3 (discussing transfer of data regarding specific online

transaction in one embodiment of the invention.))

In sum, as a practical, specific application of the general concept of

transaction guaranties and an improvement to the prior art, "the claimed invention

is not so manifestly abstract as to override the statutory language of section 101."

*See Ultramercial*, 722 F.3d at 1354 (quotations omitted).  The Claims at issue do

not seek to patent performance guaranties but rather claim a functional application in an E-commerce environment.  *Research Corp. Tech., Inc. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010) (finding algorithms and formulas, even though a significant part of the claimed process, did not render the claims patent ineligible where the claimed invention covered a specific process for halftoning in computer applications).  The additional Claim limitations reciting how that idea is implemented "narrow, confine, or otherwise tie down the claim so that, in practical terms, it does not cover the full abstract idea itself."  *CLS Bank,* 717 F.3d at 1282.

### B.    The '019 Patent Claims Are Directed to Patent-Eligible Material Under the Reasoning of Recent Federal Circuit Cases

#### 1.    The Asserted Claims of the '019 Patent Are Patent-Eligible Under the Analysis Set Forth in the Opinion Authored by Judge Lourie in *CLS Bank*

The Federal Circuit recently has analyzed U.S. Supreme Court precedent in cases involving computer-based and E-commerce claims—specifically, in *CLS Bank Int'l v. Alice Corporation Pty. Ltd*. and *Ultramercial, Inc. v. Hulu, LLC*.  An analysis of these cases further demonstrates that the '019 Patent Claims recite patent-eligible subject matter.

The opinion authored by Judge Lourie in the recent decision of the Court of Appeals for the Federal Circuit, sitting *en banc*, in *CLS Bank* ("Lourie Opinion") demonstrates that the asserted claims of the '019 Patent are patent-eligible.  717 F.3d 1269.  In particular, the online commercial transaction, computer processing

22

and temporal limitations recited in the '019 Patent Claims satisfy the test set forth in the Lourie Opinion.

That opinion, analyzing Supreme Court precedent, set forth a multi-step test for determining whether claims are patent-eligible. First, the Court must "identify and define whatever fundamental concept appears wrapped up in the claim[.]" *Id*. at 1282. Next, the Court must determine whether "additional substantive limitations … narrow, confine, or otherwise tie down the claim so that, in practical terms, it does not cover the full abstract idea itself." *Id*. There must be an inventive concept or "a genuine human contribution to the claimed subject matter" and the contribution must "narrow the claim relative to the fundamental principal[.]" *Id*. at 1282-83.

In *CLS Bank*, the Lourie Opinion stated that the claims lacked any express language to define the computer's participation—there was no specific or limiting recitation of essential or improved computer technology and was merely "insignificant postsolution activity." *Id*. at 1286. Additionally, the opinion found no indication in the record that the precise moment chosen to execute certain limitations made "any significant difference in the ultimate application of the abstract idea." *Id*. at 1287.

Here, the abstract concept is providing transaction performance guaranties. In contrast to *CLS Bank*, the Claims, aside from reciting the transaction

performance guaranty itself, recite substantive limitations requiring an online commercial transaction, specific requirements for the computer's participation and a temporal limitation.

As noted above, the online transaction limitation and computer process limitations are essential to the Claims and cannot be considered to be merely insignificant post-solution activity. And the temporal limitation precludes the possibility of preemption of transaction performance guaranties. The temporal limitation ties the claim down to a specific instance, is a critical distinction over the prior art in the application of transaction performance guaranties and permits the underwriting to attach to a specific transaction. (*See* A-703-A-704.) This contrasts directly with *CLS Bank*, where the Lourie Opinion found that the precise moment chosen to execute certain instructions did not make any significant difference in the application of the abstract idea. *CLS Bank*, 717 F.3d at 1287.

Thus, under the analysis laid out in the Lourie Opinion, the '019 Patent Claims are patent-eligible.

> **2.    The Asserted Claims of the '019 Patent Are Patent-Eligible Under the Analyses Articulated in *Ultramercial* and in the Opinion Authored by Judge Rader in *CLS Bank***

Similarly, the Claims are patent-eligible when viewed with the analytic lens of this Court in the recent *Ultramercial* case and by certain members of this Court joining Chief Judge Rader's opinion in *CLS Bank* ("Rader Opinion").

24

In *Ultramercial,* this Court held that a claim is not patent-eligible if, rather than claiming an application of an abstract idea, the claim is to the abstract idea itself.  722 F.3d at 1343 (citing *Bilski*, 130 S. Ct. at 3230).  "[T]he relevant inquiry is whether a claim, as a whole, includes *meaningful* limitations restricting it to an application, rather than merely an abstract idea."  *Ultramercial*, 722 F.3d at 1344. A claim is meaningfully limited when it requires a particular machine implementing a process or a particular transformation of matter or where it recites additional limitations essential to the invention, *i.e.*, that are "central to the solution itself."  *Id.* at 1347.  In contrast, a claim is not meaningfully limited when:  (1) it merely describes an abstract idea or simply adds "apply it,"—in other words, the claim pre-empts all practical uses of the abstract idea; (2) "it contains only insignificant or token pre- or post-solution activity—such as identifying a relevant audience, a category of use, field of use, or technological environment;" and (3) the "limitations provide no real direction, cover all possible ways to achieve the provided result, or are overly generalized."  *Id.* at 1345-46.

In *Ultramercial*, this Court found meaningful limitations restricted the claim to an application of the abstract concept, in part because:  (1) "several steps plainly require[d] that the method be performed through computers, on the [I]nternet, and in a cybermarket environment;" (2) the invention was  "a specific application of a method implemented by several computer systems, operating in tandem, over a

communications network;" and (3) the claims required "controlled interaction with a consumer over an Internet website, something far removed from *purely* mental steps." *Id*. at 1350-51, 1354.

Similarly, in *CLS Bank*, the Rader Opinion noted that, for the apparatus claims, (1) "the claim covers the use of a computer and other hardware specifically programmed to solve a complex problem," (2) the claim contained separate structural and functional limitations where the specification explained implementation by a special purpose computer system, and (3) the specification included numerous flowcharts to provide algorithm support for the functions. *Id.* at 1307. Thus, the Rader Opinion held those claims patent-eligible.

Here, the Claims are directed to a particular machine similar to, but more limited than, that claimed in *Ultramercial* and *CLS Bank*. As described above, the '019 Patent Claims include an online commercial transaction limitation, limitations with specific requirements for the computer's participation, and a temporal limitation that are neither required nor inherent in the concept of transaction performance guaranties. The '019 specification describes specific communications, routings and algorithms for performing these steps. (*See, e.g.*, A-22, Fig. 8; A-40-A-41, col. 8, l. 65-col. 9, l. 46.) The steps in the Claims describe a specific application of a method implemented by several computer systems, operating in tandem over a network. As recognized by the Court in *Ultramercial*,

this plainly requires and limits the method to being performed through computers, on the Internet and in a cybermarket environment through complex computer programming. *See Ultramercial*, 722 F.3d at 1350. As in *Ultramercial*, these limitations move the Claims into patentable territory and to label such a method as "abstract" "wrenches meaning from the word." *See id*.

Accordingly, under the inquiries enunciated in *Ultramercial* and the Rader Opinion in *CLS Bank*, the '019 Patent Claims are patent-eligible.

### 3. The Asserted Claims of the '019 Patent Are Patent-Eligible Under the Analyses Contained in the Opinions Authored by Judge Moore, Judge Newman and Judge Linn in *CLS Bank*

Similarly, the Claims of the '019 Patent are valid under the analysis of Supreme Court precedent in the opinion authored by Judge Moore in *CLS Bank* ("Moore Opinion"). The Moore Opinion emphasizes that "the key question is []" whether a claim recites a sufficiently concrete and practical application of an abstract idea to qualify as patent-eligible." *CLS Bank*, 717 F.3d at 1315. The opinion warned against "stripping away all known elements from the …claims" and analyzing only the abstract idea, as opposed to the claim as a whole. *Id*. This opinion emphasizes the errors of the approach adopted by the district court in reducing the Claims of the '019 patent to "the general concept of performance guaranties." (*See* A-11-A-12.) Finally, the Moore Opinion notes that the Federal Circuit applied the machine-or-transformation test principles "to hold patent-

27

eligible a claim that would read on a general purpose computer programmed to carry out the operations recited in the claim." *Id*. at 1316 (*citing In re Alappat*, 33 F.3d 1526, 1545 (Fed.Cir.1994) (en banc)). As explained above, the '019 Patent Claims recite a specific, practical application and read on a computer that has been programmed to carry out the precise limitations of the asserted Claims.

The Claims of the '019 Patent are patent-eligible as well under the opinion authored by Judge Newman. *Id*. at 1325-26 (noting that "[a]ll scientific and technologic advance starts with fundamental principles" and urging the Court "return to the statute, and hold that when the subject matter is within the statutory classes in section 101, eligibility is established").

Finally, the Claims are patent-eligible under the opinion authored by Judge Linn. *Id.* at 1328-29 (noting that the parties agreed that the claims-at-issue must be implemented electronically and arguing against a reading broader than stipulated). This opinion urged that a careful assessment of *all* the claim limitations guide the inquiry and warned against disembodying a patent-eligibility inquiry "from the actual claims at issue, with their attendant limitations." *Id*. at 1331. Because the '019 Patent Claims are directed at a specific way of offering transaction performance guaranties for online transactions, they are patent-eligible.

C. **The Claims of the '019 Patent Also Satisfy the Machine-Or-Transformation Test**

While not dispositive, the machine-or-transformation test can be "a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under § 101[.]" *Bilski,* 130 S. Ct. at 3227 (rejecting the idea that the machine-or-transformation test is the "sole test for deciding whether an invention is a patent-eligible 'process'"). The Supreme Court, however, cautioned that this test may "risk obscuring the larger object of securing patents for valuable inventions without transgressing the public domain." *Id*. The machine-or-transformation test considers whether a claimed process "is tied to a particular machine or apparatus" or "transforms a particular article into a different state or thing." *Id*. at 3226. The Claims of the '019 Patent satisfy this test.

Here, the relevant inquiry is whether the claimed process is tied to a particular machine or apparatus. *Id*. "This inquiry focuses on whether the claims tie the otherwise abstract idea to a *specific way* of doing something with a computer, or a *specific computer* for doing something; if so, they likely will be patent eligible." *Ultramercial*, 722 F.3d at 1348. Limitations that demonstrate patent-eligibility "may include the computer being part of the solution, being integral to the performance of the method, or containing an improvement in computer technology." *Id*. (citing *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1332–33 (Fed. Cir. 2010) (noting that "a machine," a GPS receiver, was

29

"integral to each of the claims at issue" and "place[d] a meaningful limit on the scope of the claims")).

As described in Sections II.A and II.B, *supra*, the integral nature of the computer requirements in the Claims contradict the district court's finding that the asserted Claims fail the machine-or-transformation test. The limitations of buySAFE's Claims that require a specific computer to perform particular steps create a special-purpose computer. *See Bilski*, 130 S. Ct. at 3227 (an important clue that a claim embracing an abstract idea is patent-eligible is if its use is tied to a machine); *In re Alappat*, 33 F.3d 1526, 1544-45 (Fed. Cir. 1994) (software used on a general purpose computer "creates a new machine, because a general purpose computer in effect becomes a special purpose computer once it is programmed to perform particular functions" and may be patent-eligible).

The district court erred in finding that the asserted Claims are not "directed to any specific way of using a computer to guarantee a safe transaction" but rather simply "directed to a method that just happens to be performed by a computer." (A-11.) Specifically, the district court found that the underwriting step in the Claims may be performed by a person and not on a computer. (A-8) In support of this finding, the district court cited to a portion of the patent specification that discusses determining the eligibility of a party to qualify for underwriting and notes that the underwriter may be a person that may carry out the underwriting

process either manually or automatically through a computer program.  (A-8 (citing to A-39, col. 6, ll. 57-60).)

But this process cited by the district court is not a limitation of the Claims. Rather, the underwriting step cited by the Court is disclosed to occur when an online seller requests approval for underwriting services and the transaction guaranty provider determines whether to offer its services to that seller based on the seller's credit eligibility.  (*See* A-39, col. 6, ll. 43-65.)   The underwriting limitation in the Claims refers to underwriting a specific online transaction, via a computer and over a computer network.  This step in the Claims requires confirmation that the requesting party is a party that has been determined eligible for underwriting, and thus, requires the identification of and communication between the parties through verifications and protocols provided in a network environment.  (*See, e.g.*, A-29; A-43, col. 14, ll. 63-67; col. 15, ll. 16-30 (prescreening results in authentication key for subscriber and then a second authentication key is generated at time of a particular transaction.))

The Patent cannot be divorced from computers because online commercial transactions are essential to and at the heart of the invention.  The method cannot be performed absent computers—*i.e.*, over the phone or with pen and paper— because it requires server systems executing the online commercial transaction and is tied to each specific online transaction with certain steps performed through the

computer network, between specific parties and by computer applications. (*See, e.g.*, A-45, Claim 1.)  This is done through specific computer code that creates a specific machine.  Moreover, the processing of the underwriting limitation requires transmission of information and verification protocols for the specific computers within the network.  (*See, e.g.*, A-44, col. 15, ll. 1-30.)  This requires concrete, specific code creating a specialized machine that transmits this information to the third-party provider.  Thus, the '019 Patent describes a specific computer programmed using specific algorithms, such that the computer plays a meaningful role in the application of the claimed invention and is integral to the Claims.  The infrastructure required by the Claims is clearly not abstract.  *See Research Corp.*, 627 F.3d at 868-69 (finding invention with "functional and palpable applications in the field of computer technology" patent-eligible).  Thus, the claimed process is tied to a particular machine or apparatus.

## CONCLUSION

For the reasons described above, buySAFE respectfully requests that this Court reverse the finding of the court below and hold the '019 Patent Claims to be patent-eligible.

Dated: October 21, 2013                     Respectfully submitted,


                                            */s/ Stephen M. Hankins*
                                            Stephen M. Hankins
                                            SCHIFF HARDIN LLP
                                            One Market, Spear Street Tower
                                            Thirty-Second Floor
                                            San Francisco, CA 94105
                                            (415) 901-8756

# Addendum

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

BUYSAFE INC.,                          :
                                       :
            Plaintiff,                 :
                                       :
      v.                               :        Civil Action No. 11-1282-LPS
                                       :
GOOGLE, INC.,                          :
                                       :
            Defendant.                 :

## <u>JUDGMENT IN A CIVIL CASE</u>

At Wilmington this 19th day of **August, 2013**.

For the reasons set forth in the Court's Memorandum Opinion and Order dated

July 29, 2013 (D.I. 69, 70);

IT IS ORDERED AND ADJUDGED that judgment be and is hereby entered in

favor of Defendant and against Plaintiff.

_____
UNITED STATES DISTRICT JUDGE


_____
(By) Deputy Clerk

**A-1**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BUYSAFE, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 11-1282-LPS |
| | : | |
| GOOGLE INC., | : | |
| | : | |
| Defendant. | : | |

### O R D E R

At Wilmington this 29th day of July, 2013,

IT IS HEREBY ORDERED that:

Defendant Google Inc.'s motion for judgment on the pleadings (D.I. 31) IS GRANTED.

_____
UNITED STATES DISTRICT JUDGE

**A-2**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BUYSAFE, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 11-1282-LPS |
| | : | |
| GOOGLE INC., | : | |
| | : | |
| Defendant. | : | |

Joseph J. Farnan, Jr., Esq., Brian E. Farnan, Esq., FARNAN LLP, Wilmington, DE.
    Attorneys for Plaintiff buySAFE, Inc.

Jack B. Blumenfeld, Esq., Paul Saindon, Esq., MORRIS, NICHOLS, ARSHT & TUNNEL LLP,
Wilmington, DE.
    Attorneys for Defendant Google Inc.

## MEMORANDUM OPINION

July 29, 2013
Wilmington, Delaware

**STARK, U.S. District Judge:**

Pending before the Court is Defendant Google Inc.'s ("Defendant") motion for judgment

on the pleadings under Fed. R. Civ. P. 12(c). (D.I. 31)  Defendant argues that Plaintiff buySAFE,

Inc.'s ("Plaintiff") U.S. Pat. No. 7,644,019 ("the '019 patent") is invalid under 35 U.S.C. § 101

because it is directed to non-patent-eligible subject matter.

The parties completed briefing for this motion on August 31, 2012.  (D.I. 32, 40, 42)  The

Court heard oral argument on October 26, 2012.[1]  (D.I. 49) (hereinafter "Tr.")  On May 17, 2013,

the Court ordered the parties to submit supplemental briefs "for the purpose of addressing the

effect, if any, of the *en banc* decision of the United States Court of Appeals for the Federal

Circuit" in *CLS Bank International v. Alice Corp. Pty Ltd.*, 717 F.3d 1269 (Fed. Cir. 2013),

which was issued on May 10, 2013.  (D.I. 58)  The parties submitted their supplemental briefs on

May 28, 2013.  (D.I. 59, 60)

For the reasons set forth below, the Court will grant Defendant's Rule 12(c) motion.

## I.    BACKGROUND

Plaintiff filed this patent infringement action against Defendant on December 22, 2011,

alleging that Google's "Trusted Stores" program infringes the '019 patent.  (D.I. 1)  The '019

patent is entitled "Safe Transaction Guaranty" and generally relates to providing a guaranty

service for online transactions.

The '019 patent contains two independent claims, claim 1 and claim 39.  Claim 1 is a

process claim.  Claim 39 requires a "machine readable medium" capable of performing the

process of claim 1.  The parties agree that, for purposes of Defendant's Rule 12(c) motion, there

---

[1]At the same hearing, the parties presented their claim construction arguments.  The Court's
claim construction ruling, which is being issued separately today, has no impact on Defendant's
Rule 12(c) motion.

**A-4**

are no material differences between claims 1 and 39.  (D.I. 32 at 3, D.I. 40 at 2)

Claim 1 is reproduced below:

> A method, comprising:
>
> receiving, by at least one computer application program running on a computer of a safe transaction service provider, a request from a first party for obtaining a transaction performance guaranty service with respect to an online commercial transaction following closing of the online commercial transaction;
>
> processing, by at least one computer application program running on the safe transaction service provider computer, the request by underwriting the first party in order to provide the transaction performance guaranty service to the first party,
>
> wherein the computer of the safe transaction service provider offers, via a computer network, the transaction performance guaranty service that binds a transaction performance guaranty to the online commercial transaction involving the first party to guarantee the performance of the first party following closing of the online commercial transaction.

Claims 1, 14, 39, and 44 are the only asserted claims in this action, and the only claims Defendant contends are invalid.  (Tr. at 26-27)  Dependent claims 14 and 44 are identical, except that claim 14 depends from claim 1 while claim 44 depends from claim 39.

## II.    LEGAL STANDARDS

Pursuant to Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings "[a]fter pleadings are closed – but early enough not to delay trial." When evaluating a motion for judgment on the pleadings, the Court must accept all factual allegations in a complaint as true and view them in the light most favorable to the non-moving party. *See Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008); *see also Maio v. Aetna, Inc.,* 221 F.3d 472, 482 (3d Cir. 2000).  A Rule 12(c) motion will not be granted "unless the movant

2

**A-5**

clearly establishes that no material issue of fact remains to be resolved and that he is entitled to

judgment as a matter of law." *Rosenau*, 539 F.3d at 221. This is the same standard as a Rule

12(b)(6) motion to dismiss. *See Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir.

1991). "The purpose of judgment on the pleadings is to dispose of claims where the material

facts are undisputed and judgment can be entered on the competing pleadings and exhibits

thereto, and documents incorporated by reference." *Venetec Int'l, Inc. v. Nexus Med., LLC,* 541

F. Supp. 2d 612, 617 (D. Del. 2008); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d

1410, 1426 (3d Cir. 1997) (explaining that any documents integral to pleadings may be

considered in connection with Rule 12(c) motion).

## III.    DISCUSSION

Defendant seeks judgment on the pleadings that the '019 patent is invalid because it fails

to meet the subject matter eligibility requirements of 35 U.S.C. § 101.[2]  (D.I. 32 at 1)  Section

101 provides that "[w]hoever invents or discovers any new and useful process, machine,

manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a

patent therefore, subject to the conditions and requirements of this title." 35 U.S.C. § 101.  There

are three recognized exceptions to Section 101 – "laws of nature, physical phenomena, and

abstract ideas" – and if a claim is directed on one of these exceptions, it is not eligible for patent

protection. *Bilski v. Kappos*, 130 S. Ct. 3218, 3225 (2010).  Defendant's Rule 12(c) motion

concerns only the "abstract ideas" exception.  (D.I. 32 at 1)

To determine whether a patent claims an abstract idea, courts frequently apply the

---

[2]The standard of proof to establish the invalidity of a patent is clear and convincing evidence.
*See WMS Gaming Inc. v. International Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999).

3

**A-6**

"machine-or-transformation" test. *See Bilski*, 130 S. Ct. at 3227. The Supreme Court has cautioned, however, that the machine-or-transformation test is not the sole test for patent-eligibility. *See id.* Accordingly, courts also should more generally examine the abstract nature of the claims. *See CyberSource Corp. v. Retail Decisions*, Inc., 654 F.3d 1366, 1371 (Fed. Cir. 2011).

Defendant contends that the asserted claims are not patent-eligible because they: (1) fail the machine-or-transformation test; and (2) are directed to an abstract idea. (D.I. 32 at 8)

## A.     Machine-or-Transformation

Under the machine-or-transformation test, a process claim is patent-eligible if: "(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." *Bilski*, 130 S. Ct. at 3224 (internal citations omitted). Because Plaintiff has not argued that any article is transformed (Tr. at 51-52), the Court's analysis is limited to the "machine" prong of the test.

"[T]o impart patent-eligibility to an otherwise unpatentable process under the theory that the process is linked to a machine, the use of the machine must impose meaningful limits on the claim's scope." *CyberSource*, 654 F.3d at 1375 (internal quotation marks omitted). The Federal Circuit has stated that a machine will only "impose a meaningful limit on the scope of a claim [when it plays] a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations." *SiRF Tech., Inc. v. ITC*, 601 F.3d 1319, 1333 (Fed. Cir. 2010). A computer is not a significant part the process if that process can be performed without a computer. *See CyberSource*, 654 F.3d at 1375 ("[M]erely

4

**A-7**

claiming a software implementation of a purely mental process that could otherwise be performed without the use of a computer does not satisfy the machine prong of the machine-or-transformation test.").

The '019 patent, on its face, explains that the entire inventive process can be performed by a human. For instance, with respect to the key "underwriting" step, the '019 patent states that: "[t]he underwriter may be *a person*, a corporation that *carries out the underwriting process* either *manually* or automatically through a computer application program or semi-automatically." ('019 patent at col. 6, ll. 57-60) (emphasis added)[3] At oral argument, Plaintiff's counsel acknowledged that "if the transaction was not online," each of the steps "could be conducted without a computer." (Tr. at 61) A method that can be performed entirely in the human mind is an abstract idea and is not eligible for patent protection. *See CyberSource*, 654 F.3d at 1375.

Nonetheless, Plaintiff contends that the claimed process is patent-eligible because it takes place online, and online transactions by definition require a computer. (Tr. at 45-48, 51) The Court disagrees. In *CyberSource*, 654 F.3d at 1370, the patent was also limited to online transactions – "a method for verifying the validity of a credit card transaction over the Internet" – yet the Federal Circuit found the patent invalid under Section 101.

Plaintiff further contends that "there is simply no practical way to do [the process of the

---

[3]At oral argument, Plaintiff argued that the Court could not look to the specification of the '019 patent for purposes of evaluating patent-eligibility in a Rule 12(c) context. (Tr. at 56) But the authority cited by Plaintiff does not stand for this proposition, as it did not even involve a Rule 12(c) motion. *See DealerTrack, Inc. v. Huber*, 674 F.3d 1315, 1317 (Fed. Cir. 2012) (appeal of summary judgment finding of invalidity). Moreover, Plaintiff conceded that the Court can look to the prosecution history for purposes of Rule 12(c) (Tr. at 55), and the specification is at least as pertinent to the Court's inquiry.

5

**A-8**

'019 patent] mentally or with a pen and paper," because it involves "millions" of online

transactions. (Tr. at 54)  That argument is not persuasive.  The '019 patent describes a well-

known, and widely-understood concept – a third party guarantee for a sales transaction – and

then applies that concept using conventional computer technology and the Internet.  Merely using

a computer to perform more efficiently what could otherwise be accomplished manually does not

confer patent-eligibility.  *See Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Can.*, 687 F.3d

1266, 1279 (Fed. Cir. 2012) ("Using a computer to accelerate an ineligible mental process does

not make that process patent-eligible."); *MySpace, Inc. v. Graphon Corp.*, 672 F.3d 1250, 1267

(Fed. Cir. 2012) ("While running a particular process on a computer undeniably improves

efficiency and accuracy, cloaking an otherwise abstract idea in the guise of a

computer-implemented claim is insufficient to bring it within section 101.").

The '019 patent likewise does not become patent-eligible by explicitly reciting a

"computer" in each independent claim.  In the '019 patent, the computer (or machine readable

medium) is used only for processing – a basic function of any general purpose computer.  The

claims do not require specific programming, nor are they tied to any particular machine.  The

claims do not provide any detail as to how the computer is involved in the claimed process, or

describe the significance of the computer to that process.  In fact, the patent's process would be

performed exactly the same way by a person and by a computer, the only difference being that

the computer performs the process significantly faster than a human.  Such a process is not

patent-eligible.  *See DealerTrack*, 674 F.3d at 1333 (finding claims invalid because they are

"silent as to how a computer aids the method, the extent to which a computer aids the method, or

the significance of a computer to the performance of the method"); *CyberSource*, 654 F.3d at

**A-9**

1375 (emphasizing "that the basic character of a process claim drawn to an abstract idea is not

changed by claiming only its performance by computers"); *MySpace*, 672 F.3d at 1267 (finding

that claim is not patent eligible "simply because it is computer-implemented or invokes the use

of the Internet").

Contrary to Plaintiff's argument (D.I. 59 at 9), the "temporal limitation" of the claims –

requiring "bind[ing] a transaction performance guaranty to the online commercial transaction . . .

following closing of the online commercial transaction" – does not save the validity of the

claims. The temporal limitation is not dependent on any specific programming, nor is it tied to

any particular machine. Moreover, according to the claim, *every* step of the claimed method

occurs "following closing of the online commercial transaction," including the very first

"receiving" step. Thus, the claim is directed to the concept of guaranteeing the performance of a

transaction after that transaction is closed. This is not sufficient to transform an unpatentable

abstract idea into a patent eligible application of the idea.

Plaintiff's original briefs relied heavily on the panel opinion in *CLS Bank Int'l v. Alice

Corp. Pty.*, 685 F.3d 1341, 1351 (Fed. Cir. 2012), which reasons that "a claim that is drawn to a

specific way of doing something with a computer is likely to be patent eligible whereas a claim to

nothing more than the idea of doing that thing on a computer may not." (D.I. 40 at 6-12)  The

*CLS* panel's opinion was subsequently vacated and reversed by an *en banc* ruling of the Federal

Circuit, which found the claims at issue to be ineligible for patent protection. *See CLS Bank Int'l

v. Alice Corp. Pty*, 717 F.3d 1269 (Fed. Cir. 2013) (en banc). The Federal Circuit's *en banc*

decision in *CLS* reiterated the principle that "simply appending generic computer functionality to

lend speed or efficiency to the performance of an otherwise abstract concept does not

7

**A-10**

meaningfully limit claim scope for purposes of patent eligibility." *Id.* at 1286 (citing, *inter alia,*
*Bancorp*, 687 F.3d at 1278; *Dealertrack*, 674 F.3d at 1333). But, even under the reasoning of the
*CLS* panel decision, the Court would have found the claims patent-ineligible because Plaintiff
has not shown that the '019 patent claims are directed to any specific way of using a computer to
guarantee a safe transaction. Rather, as described above, the claims are directed to a method that
just happens to be performed by a computer. Under the now governing *en banc* decision in *CLS*,
Defendant's argument for patent-ineligibility is even stronger.

For these reasons, the Court concludes that independent claims 1 and 39 of the '019
patent fail the machine-or-transformation test. So do dependent claims 14 and 44, as these
claims do not recite any additional computer elements.[4]

**B.    Abstract Idea**

Because the Supreme Court has found that the machine-or-transformation test is not
dispositive in a Section 101 inquiry, the Court proceeds to examine more generally the abstract
nature of the claims. *See Cybersource*, 654 F.3d at 1371. "The focus of this inquiry is on the
extent to which the application of an abstract idea is specific and/or limited, because inventions
with specific applications are less likely to be abstract." *Accenture Global Servs., GmbH v.*
*Guidewire Software, Inc.*, 800 F. Supp. 2d 613, 621 (D. Del. 2011) (internal quotation marks
omitted).

The Court concludes that the '019 patent is directed to an abstract – and, therefore,
unpatentable – process of underwriting commercial transactions by a third party to guarantee

---

[4]In opposing Defendant's motion, Plaintiff did not rely on any element of claims 14 and 44 that is
absent from the corresponding independent claims.

8

**A-11**

performance. The claimed concept is not directed to any specific device or system, is not limited to a concrete application, and is not limited to any specific industry. Allowing Plaintiff to patent the general concept of performance guaranties would effectively grant a monopoly over an abstract idea. Instead, the Court will grant Defendant's motion for judgment on the pleadings with respect to claims 1, 14, 39, and 44.

## IV.    CONCLUSION

The Court concludes that claims 1, 14, 39, and 44 of the '019 patent are not eligible for patent protection under 35 U.S.C. § 101 and, therefore will grant Defendant's motion for judgment on the pleadings. An Order consistent with this Memorandum Opinion will be entered.

US007644019B2

(12) **United States Patent**    (10) **Patent No.:**   **US 7,644,019 B2**

Woda et al.    (45) **Date of Patent:**   **Jan. 5, 2010**

(54) **SAFE TRANSACTION GUARANTY**

(75) Inventors: **Steven L Woda**, Washington, DC (US); **Jeffrey E Grass**, Hermosa Beach, CA (US)

(73) Assignee: **Buysafe, Inc.**, Alexandria, VA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1239 days.

(21) Appl. No.: **10/419,269**

(22) Filed: **Apr. 21, 2003**

(65) **Prior Publication Data**

US 2004/0210527 A1   Oct. 21, 2004

(51) **Int. Cl.**
*G06Q 40/00*    (2006.01)

(52) **U.S. Cl.** ............................ **705/35**; 705/37; 705/38; 705/39

(58) **Field of Classification Search** .................. 705/35, 705/37, 38

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,549,888 B1 | 4/2003 | Aieta et al. | |
| 6,839,689 B2 | 1/2005 | Aieta et al. | |
| 2001/0039524 A1 * | 11/2001 | Harrison, Jr. et al. | 705/34 |
| 2003/0033240 A1 * | 2/2003 | Balson et al. | 705/37 |

OTHER PUBLICATIONS

Gassen, Timothy. "Robby the Robot would marvel at how he is sold." Arizona Daily Star. Feb 22, 1999., p. 7E.*

§ WLI BuyerAssurance.com: Online Incentives Boost Revenue, Turning e-Commerce Browsers into Loyal Customers—Customized, Branded Instant Rewards Differentiate Online Merchant's Web Site With Best Price Guarantees, Extended . . . Business Wire Wednesday, Oct. 1, 2003.*

§ BuyBidWin.com Offers SatisFusion's After Sales Support Platform On Its E-Store Front Dateline: Long Beach, Calif., May 8, 2001.*

http://www.simplebond.com, "Online Surety Bond Applications", Jun. 12, 2003, 3 pages.

Tradesafe.com, "The Company—Tradesafe.com—empowering sellers and protecting buyers", 1999-2000, 3 pages.

Tradesafe.com, "Buyer's Guide", 1999-2000, 1 page.

Tradesafe.com, "Welcome to Tradesafe Payments", 1999-2000, 2 pages.

Tradesafe.com, "Tradesafe.com™ Chosen by AuctionWatch.com To Provide Guaranteed Payment Service For Online Buyers and Sellers", News Release, Jul. 25, 2000, 2 pages.

Tradesafe.com, "Tradesafe.com™ Receives $10 Million in Venture Funding from Germany's IQ Capital", News Release, Mar. 13, 2000, 2 pages.

Tradesafe.com, "Tradesafe.com™ Partners with Online Auction Site boxLot.com for On-Line Payment Service", News Release, Dec. 17, 1999, 2 pages.

(Continued)

*Primary Examiner*—Alexander Kalinowski
*Assistant Examiner*—Abhishek Vyas
(74) *Attorney, Agent, or Firm*—Barnes & Thornburg LLP

(57) **ABSTRACT**

A method and system is provided for safe online commercial transaction. When a safe transaction service provider receives a request from a first party for obtaining a transaction performance guaranty service, the safe transaction service provider processes the request by underwriting the first party. If the underwriting is successful, the transaction performance guaranty service is provided to the first party which binds a transaction performance guaranty to an online commercial transaction involving the first party and guarantees the first party's performance when the first party and a second party enter the online transaction.

**52 Claims, 22 Drawing Sheets**



US 7,644,019 B2

Page 2

## OTHER PUBLICATIONS

Tradesafe.com, "Tradesafe.com™ Chosen by Lycos to Provide Online Escrow Service", News Release, Oct. 1, 1999, 2 pages.
Tradesafe.com, "Opoly Enterprises Teams with Tradesafe.com™ to Protect Users Against Online Frauds", News Release, Apr. 25, 2000, 2 pages.
Tradesafe.com, "Seller's Guide", 1999-2000, 2 pages.
Tradesafe.com, "Being a Seller—Being a Buyer", 1999-2000,4 pages.
Tradesafe.com, "TradeSafe Online Corporation", 1995-1999, 1 page.
Tradesafe.com, "Internet Archive WayBackMachine", 2001, 1 page.
Tradesafe.com, "The Tradesafe Payments Guarantee", 1999-2000, 2 pages.
Tradesafe.com, "Transactions over $1200", 1999-2000, 2 pages.
Tradesafe.com, "What is 1StepSurety?", Jan./Feb. 1999, 3 pages.
Tradesafe.com, "Why are we special?", Jan./Feb. 1999, 1 page.
Tradesafe.com, "Commerical Surety", Jan./Feb. 1999, 1 page.
Tradesafe.com, "What is 1StepSurety", Jan./Feb. 1999, 1 page.
The Hartford Group Inc., "New Bond System Goes One Step Beyond", Jan. 2001, 4 pages.
www.findarticles.com/p/articles/mi_m0BJK/is_14_11/ ai_67315633, "Marsh Debuts Online Guarantee Program", Nov. 2000, 2 pages.
Suretybond.com, 2000, 1 page.
Suretybond.com, "How Does Suretybond.com Benefit Exchanges", 2000, 2 pages.
Suretybond.com, "SuretyBond guarantees online deals get done", 2000, 2 pages.
InSure Vision, "Welcome to IVT", Sep. 15, 2003, 1 page.
InSure Vision, "What's New", News Archive, Feb. 12, 2001-Sep. 15, 2003, 1 page.
InSure Vision, News Archive, Oct. 28, 1999-Nov. 27, 2000, 1 page.
InSure Vision, "About IVT—Corporate Overview", 1999-2000, 1 page.
InSure Vision, "InSure Vision Technologies, LLC Announces the Opening of East Coast Office", Jan. 5, 2000, 1 page.
InSure Vision, "InSure Vision Technologies, LLC Welcomes Aboard Thomas Rutherford, Inc.", Rutherford, Inc. Dec. 29, 1999, 1 page.
InSure Vision, InSure Vision Technologies, LLC Announces Alliance with CNA Surety, Oct. 28, 1999, 1 page.
InSure Vision, "InSure Vision Technologies, LLC Releases SurePath 1.3", Jul. 5, 2000, 1 page.
www.insurancejournal.com/news/national/2000/07/18/11203.htm, "Esurety Launches Agent Web Site", Jul. 18, 2000, 2 pages.
"CorpHQ Announces E-Commerce Partnership With Contractors Bonding and Insurance Co.", Business Wire Article, May 26, 1999, 2 pages.
www.findarticles.com/p/articles/mi_mi_m0EIN/ is_1999_Dec_6/ai_58036443/print, "Repeat/Esurance Secures $34 Million in Second Round of Financing; First Multi-State Internet Insurance Company Receives Funding From Prominent Silicon Valley Venture Capital Firms", Nov. 19, 2004, 16 pages.

Internet Archive Wayback Machine, 2001, 5 pages.
InSure Vision Technologies, "The Bonding of Tradition and Technology", 2 pages.
InSure Vision, "What's New", News Release, Oct. 28, 1999-Mar. 20, 2000, 1 page.
InSure Vision, "SurePath—Security Bond Processing", Feb. 9, 2005, 1 page.
InSure Vision, "SurePath Demo", Feb. 9, 2005, 3 pages.
InSure Vision, "SurePath Demo", Feb. 9, 2005, 1 page.
www.insurancejournal.com/news/national/2000/05/11/11012.htm, "E-Surety.net Unveils Surety Bond Site", May 11, 2000, 2 pages.
Internet Archive Wayback Machine, 2001, 1 pages.
web.archive.org/web/20010208094919/www.webtradeinsure.com, "Auction Sites", Feb. 10, 2005, 1 page.
web.archive.org/web/20001102115648/www.webtradeinsure.com, "Frequently Asked Questions", Feb. 10, 2005, 1 page.
web.archive.org/web/20000619212149/www.webtradeinsure.com, "Get Coverage", Feb. 10, 2005, 3 pages.
web.archive.org/web/20010208104347www.webtradeinsure.com, "Sellers", Feb. 10, 2005, 2 pages.
web.archive.org/web/20000407174703/www.webtradeinsure.com, "About WebTradeInsure", Feb. 10, 2005, 1 page.
www.dovebid.com/company/news/pr_000906_transaction.asp, "Dovebid® Announces Seven New Transaction Support Services", Press Release, Sep. 6, 2000, 4 pages.
www.purchasing.com/article/CA139426.html, "Net Services", Newsletter, Aug. 24, 2000, 2 pages.
www.antiquesandthearts.com/AnatomyLesson.asp?d=Archive20, "Online Insurance", Feb. 11, 2005, 2 pages.
www.auctionpatrol.com/Auction_Resources/more2.html, "Auction Resources", 2001-2004, 7 pages.
www.insurancejournal.com/news/west/2000/07/28/12068.htm, "Calif. Company Offers Coverage for Online Auction Purchases", Jul. 28, 2000, 1 page.
www.infosecuritymag.techtarget.com/articles/august00/ departments3_n, "On the Cutting Edge", Aug. 2000, 8 pages.
www.auctionbytes.com/cab/abu/y200/m12/abu0027/s07, "This and That", Dec. 3, 2000, 2 pages.
www.vendio.com/service/tipsandtactics/buy-insurance.html, "Understanding Insurance", 1998-2005, 3 pages.
Great American Insurance's Electronic Surety: Online Notary Bonds; www.electronicsurety.com; Jul. 2, 2003.
Esuretybond.com; www.esuretybond.com/ Jul. 2, 2003.
The Bond Agency.com; www.thebondagency.com; Jul. 2, 2003.
South Coast Surety Insurance Services Inc.; www.southcoastsurety.com; Jul. 2, 2003.
"Selling fidelity and surety bonds is about to get a lot faster for agents", HTFD Financial Services Group Inc., Agent Magazine, Jan./Feb. 1999, 2 pages.
"New Bond System Goes One Step Beyond", HTFD Financial Services Group Inc., Agent Magazine, Jan./Feb. 1999, 1 page.

* cited by examiner

U.S. Patent          Jan. 5, 2010          Sheet 1 of 22          US 7,644,019 B2

A-15



**Fig. 1**

U.S. Patent

Jan. 5, 2010

Sheet 2 of 22

US 7,644,019 B2

A-16



Fig. 2

U.S. Patent          Jan. 5, 2010          Sheet 3 of 22          US 7,644,019 B2

A-17



**Fig. 3**

**A-18**



Fig. 4

U.S. Patent

Jan. 5, 2010

Sheet 5 of 22

US 7,644,019 B2

**A-19**



**Fig. 5**

U.S. Patent

Jan. 5, 2010

Sheet 6 of 22

US 7,644,019 B2

A-20

**600**

110

**Buyer**

Payment (115)

Goods (125)

120

**Seller**

610

**Marketspace Provider**

130

**Safe Transaction Service Provider**



**Fig. 6**

U.S. Patent

Jan. 5, 2010

Sheet 7 of 22

US 7,644,019 B2

A-21

<u>700</u>



Fig. 7

U.S. Patent

Jan. 5, 2010

Sheet 8 of 22

US 7,644,019 B2



Fig. 8

U.S. Patent

Jan. 5, 2010

Sheet 9 of 22

US 7,644,019 B2

A-23



Fig. 9

U.S. Patent

Jan. 5, 2010

Sheet 10 of 22

US 7,644,019 B2

A-24



Fig. 10(a)

U.S. Patent

Jan. 5, 2010

Sheet 11 of 22

US 7,644,019 B2

**A-25**



Fig. 10(b)

U.S. Patent

Jan. 5, 2010

Sheet 12 of 22

US 7,644,019 B2

A-26



Fig. 10(c)

U.S. Patent

Jan. 5, 2010

Sheet 13 of 22

US 7,644,019 B2

A-27



**Fig. 11**

U.S. Patent

Jan. 5, 2010

Sheet 14 of 22

US 7,644,019 B2



**A-28**

Receive a guaranty service request — 1205

Perform underwriting — 1210

Receive a transaction bind request — 1215

Bind performance guaranty to transaction — 1220

Close out transaction — 1225

Activate performance Guaranty (issue bond) — 1230

Claim within term? — 1235

No

Decline the claim — 1240

Yes — 1250

Process a claim

Service expired? — 1245

No

Yes

End — 1255

**Fig. 12**

U.S. Patent

Jan. 5, 2010

Sheet 15 of 22

US 7,644,019 B2

A-29



Fig. 13

U.S. Patent

Jan. 5, 2010

Sheet 16 of 22

US 7,644,019 B2

A-30



Fig. 14

U.S. Patent

Jan. 5, 2010

Sheet 17 of 22

US 7,644,019 B2

**A-31**



Fig. 15

U.S. Patent

Jan. 5, 2010

Sheet 18 of 22

US 7,644,019 B2

**A-32**



**Fig. 16**

U.S. Patent

Jan. 5, 2010

Sheet 19 of 22

US 7,644,019 B2

**A-33**



Fig. 17

A-34



Fig. 18

**A-35**



Fig. 19

U.S. Patent

Jan. 5, 2010

Sheet 22 of 22

US 7,644,019 B2

A-36

Examine a transaction
with certain terms ⟿ 2010

↓

Enter into the transaction ⟿ 2020

↓

Receive performance
guaranty information ⟿ 2030

↓

File a claim when
the other party defaults ⟿ 2040

↓

Provide information
related to the claim ⟿ 2050

↓

Receive a notification
regarding a resolution ⟿ 2060

**Fig. 20**

US 7,644,019 B2

1

### SAFE TRANSACTION GUARANTY

### BACKGROUND

1. Field of Invention

The inventions presented herein relate to methods and systems for conducting reliable transactions in an electronic commerce (e-commerce) environment. More specifically, the inventions relate to methods and systems providing a performance guaranty in a transaction.

2. Discussion of Related Art

The rapid growth in the Internet technologies and electronics has presented us with new ways for us to conduct transactions with one another. Goods are now offered for sale over the Internet. Interested purchasers can view those goods through a variety of interfaces installed on various types of electronic devices. Placing an order may be a matter of a click. An advertisement for sale of a product or a service may be posted at anytime from anywhere. So is a purchase order. All is done without having to go through the conventional process of interfacing with a human, directly or even indirectly.

E-commerce transactions have become quite efficient, but not without a price. Fraudulent transactions may occur more easily in an e-commerce environment. Without the advantages that a conventional transaction interface may have (e.g., take possession of the goods to examine the quality, validate a credit card or examine a check before a transaction occurs), a bad faith party may easily take advantage of the easy-to-use electronic links to commit fraud in the cyber space. For example, a seller may post an item for sale on one of the many auction sites. After receiving payment from a successful bidder, the seller may fail to deliver the item purchased at auction. Likewise, a buyer may make no payment when due after an ordered product has been shipped by the seller and received by the buyer.

Various attempts have been made to find solutions for these new transactional problems. One approach involves the use of "escrow". The concept of escrow is to use the services of a trusted third party to ensure a reliable transaction. Parties to a transaction deliver their performance to the trusted third party who then delivers to each party what they should receive. For example, an auction item seller may deliver the item to the trusted third party and the buyer may send the payment to the trusted third party. The trusted third party then sends the payment to the seller and the item to the buyer. If either party fails to perform, the trusted third party will not complete the transaction. One disadvantage of this solution is that it introduces a delay into the transaction.

Another solution is to introduce a collateral in the form of a performance bond. A party, e.g., a seller, who intends to be engaged in electronic transactions may use his credit card as a collateral at a third party, e.g., a performance bond service provider. The performance bond service provider is pre-authorized to charge the seller's credit card for a certain amount called, for example, a penal sum. The service provider holds this pre-authorized penal sum as a security. Under this security, one single blanket coverage is provided, up front, to cover all transactions involving the seller up to the panel sum. The seller's performance in transactions under the coverage is guaranteed. When the seller defaults, the performance bond service provider charges, under the pre-authorization, the seller's credit card to remedy the default.

### BRIEF DESCRIPTION OF THE DRAWINGS

The inventions claimed and/or described herein are further described in terms of exemplary embodiments. These exemplary embodiments are described in detail with reference to the drawings. These embodiments are non-limiting exemplary embodiments, in which like reference numerals represent similar structures throughout the several views of the drawings, and wherein:

FIG. **1** depicts a framework in which a safe transaction service provider provides a transaction performance guaranty for a transaction involving a party who obtains the safe transaction service through an underwriting process, according to an embodiment of the inventions;

FIG. **2** illustrates different exemplary forms in which a transaction performance guaranty can be provided, according to an embodiment of the inventions;

FIG. **3** describes a seller performance guaranty service which provides a transaction performance guaranty to a party involved in a transaction as a seller, according to an embodiment of the inventions;

FIG. **4** describes a buyer performance guaranty service which provides a transaction performance guaranty to a party involved in a transaction as a buyer, according to an embodiment of the inventions;

FIG. **5** depicts a framework in which a safe transaction service provider provides a transaction performance guaranty service on behalf of one or more independent underwriters, according to a different embodiment of the inventions;

FIG. **6** depicts a framework in which a safe transaction service provider provides a transaction performance guaranty to a transaction posted in a marketspace provided by a marketspace provider, according to a different embodiment of the inventions;

FIG. **7** depicts a framework in which a transaction performance guaranty bound to a transaction posted in a marketspace is provided by a marketspace provider, according to a different embodiment of the inventions;

FIG. **8** depicts an exemplary internal structure of a safe transaction service provider and its relations with other entities, according to an embodiment of the inventions;

FIG. **9** shows an exemplary internal structure of a service application processing mechanism, according to an embodiment of the inventions;

FIG. **10**(*a*) shows an exemplary internal structure of a transaction performance guaranty issuer, according to an embodiment of the inventions;

FIG. **10**(*b*) describes different exemplary forms in which a seal can be generated, according to an embodiment of the inventions;

FIG. **10**(*c*) describes exemplary means to incorporate a seal into a posting of a transaction, according to an embodiment of the inventions;

FIG. **11** depicts an exemplary internal structure of a claim processing mechanism, according to an embodiment of the inventions;

FIG. **12** is a flowchart of an exemplary process, in which a safe transaction service provider provides a transaction performance guaranty to a transaction involving a party who obtains the transaction performance guaranty service through an underwriting process, according to an embodiment of the inventions;

FIG. **13** is a flowchart of an exemplary process, in which a safe transaction service application is processed, according to an embodiment of the inventions;

FIG. **14** illustrates exemplary means used to perform a pre-screening on an applicant for transaction performance guaranty service and exemplary types of information used to carry out the pre-screening, according to an embodiment of the inventions;

**A-37**

US 7,644,019 B2

3

FIG. **15** is a flowchart of an exemplary process, in which a safe transaction service provider binds a transaction performance guaranty to a transaction, according to an embodiment of the inventions;

FIG. **16** is a flowchart of an exemplary process, in which a transaction performance guaranty is bound to a transaction when the transaction is closed, according to an embodiment of the inventions;

FIG. **17** is a flowchart of an exemplary process, in which a claim filed in compliance with a transaction performance guaranty is processed, according to an embodiment of the inventions;

FIG. **18** is a flowchart of an exemplary process, in which a claim is handled according to a resolution, according to an embodiment of the inventions;

FIG. **19** is a flowchart of an exemplary process, in which a party subscribes to a transaction performance guaranty service and operates in compliance with the terms defined by the transaction performance guaranty service, according to an embodiment of the inventions; and

FIG. **20** is a flowchart of an exemplary process, in which a party who is a beneficiary of a transaction performance guaranty operates in compliance with the terms defined by the transaction performance guaranty, according to an embodiment of the inventions.

## DETAILED DESCRIPTION

FIG. **1** depicts a framework **100** in which a safe transaction service provider provides a transaction performance guaranty for a transaction involving a party who obtains the safe transaction service through an underwriting process, according to one embodiment of the inventions. The underlying transaction involves a buyer **11** and a seller **120**. There may be a contract between the buyer **110** and seller **120** including a plurality of contractual terms associated with the underlying transaction. Such terms may include, but are not limited to, a description of goods, a sale price, a delivery date, a specified payment method, and certain quality measures related to the goods involved. According to such contractual terms, the buyer **110** has a duty to make a payment (**115**) for the goods involved and the seller **120** has a duty to deliver the goods (**125**).

A safe transaction service provider **130** provides a transaction performance guaranty service to a party involved in a transaction. The party receiving the transaction performance guaranty service is a service subscriber, i.e. a party who pays a fee to subscribe to the services of the safe transaction service provider, which may be either the buyer **110** or the seller **120**. The subscription may be termed with respect to a predetermined fixed period (e.g., 6 months) or may be termed with respect to a total coverage in terms of a dollar amount, or a hybrid.

The transaction performance guaranty service, which may be obtained for a fee, provides a separate performance guaranty on behalf of its subscriber for each transaction involving the subscriber. The guaranty may be exercised in case of default by a party to the transaction. A default may be defined as a violation of a term associated with a transaction agreement. For example, if the seller **120** subscribes to the performance guaranty service and fails to deliver goods in a particular transaction, a buyer involved in the same transaction may exercise the guaranty and file a claim to the safe transaction service provider **130**.

A transaction performance guaranty service agreement may provide an indemnity clause, which requires a service subscriber to indemnify, under certain condition, the safe

4

transaction service provider **130** for a payout that it has made. For example, if a claim is filed against the service subscriber who is subsequently determined to be at fault and the safe transaction service provider **130** compensated the party who filed the claim, the safe transaction service provider may seek reimbursement from its subscriber.

The transaction performance guaranty may be provided in a variety of different forms. FIG. **2** illustrates different exemplary forms in which a transaction performance guaranty **210** may be provided, according to an embodiment of the inventions. It may be offered in the form of a surety bond **220**, a specialized bank guaranty **230**, . . . , a specialized insurance policy **240**, or in a form of a safe transaction guaranty **250**. The safe transaction service provider **130** may provide various forms of a performance guaranty. It may also provide other forms of guaranty based on its agreement with other institutions. The safe transaction service provider **130** may provide its own guaranty in the form of, for instance, the surety bond **220** and the safe transaction guaranty **250**. The safe transaction service provider **130** may also provide a performance guaranty in forms supported by other institutions such as the specialized bank guaranty **230** supported by a bank or the specialized insurance policy **240** (or surety bond) supported by an insurance company.

The transaction performance guaranty service may be offered in a transaction driven mode, i.e. protection is provided for only a particular transaction. That is, the service binds a performance guaranty to each individual transaction involving the subscriber separately. The subscriber may obtain a transaction performance guaranty service before any transaction is in progress. Whenever an individual transaction is initiated, the subscriber may register the transaction with the safe transaction service provider **130** with information provided relating to this particular transaction (e.g., price). At this point, the safe transaction service provider **130** then binds a transaction performance guaranty to the registered transaction. Therefore, each individual transaction has a different performance guaranty associated with it. If the performance guaranty is provided in the form of a surety bond, each individual transaction has a different surety bond.

The transaction performance guaranty service may be provided at different stages of a transaction. For example, service may be engaged during the negotiating stage of a transaction (before an underlying agreement is completed between buyer and seller). When a transaction is registered and before it closes, the transaction performance guaranty service may provide a simple binding between a performance guaranty and the underlying transaction. This may serve as an indication to the parties involved that there is a performance guaranty provided for a particular party (or parties). Such an indication may promote the negotiation or bidding process preliminary to entering into a binding contract between the parties.

When a transaction closes, the focus regarding an underlying transaction may shift from negotiation/bidding to actual performance. All of the parties may not be known until the transaction closes. For example, in an auction where the seller is a subscriber of the transaction performance guaranty service, it is not clear until there is a successful bidder at the close of the auction who the buyer will be. The safe transaction service provider **130** may not be certain who will be the beneficiary under the performance guaranty provided on behalf of the subscriber (auction seller). Therefore, the safe transaction service provider **130** may actually issue a performance guaranty only after the underlying transaction is closed and the performance guaranty can be provided to the appropriate party, such as the successful auction bidder.

**A-38**

US 7,644,019 B2

5                                                    6

A service subscriber can be either the seller **120** or the buyer **110**. Similarly, a service beneficiary can be either the buyer **110** or the seller **120**. FIGS. 3 and 4 describe a seller performance guaranty service model **300** and a buyer performance guaranty service model **400**, respectively. In the FIG. 3 seller performance guaranty service model, the seller **120** subscribes to a seller transaction performance guaranty service from the safe transaction service provider **130**. The seller **120** pays the safe transaction service provider **130** a service fee (**310**) for a transaction performance guaranty service for a specified term.

During the service term, when the seller **120** initiates a transaction (e.g., intends to post an auction item on the Internet), the seller **120** registers the transaction (**320**) with the safe transaction service provider **130**. The safe transaction service provider **130** may be notified of the transaction either before or after the sale item has been posted. According to the transaction performance guaranty agreement with the seller **120**, the safe transaction service provider **130** may generate a seal (discussed later) that can be incorporated into a posting of the transaction to indicate that a transaction performance guaranty is bound to the posted transaction.

When a transaction agreement is reached (e.g., a winner is determined in an auction), the buyer is identified. At this point, the safe transaction service provider **130** considers the buyer **110** as the beneficiary of the seller's performance guaranty in this transaction and binds the seller's performance guaranty with respect to the transaction with buyer **110**. The buyer **110** is then notified of the seller's performance guaranty (**350**).

Under a seller's transaction performance guaranty, when the seller **120** violates a term regarding the transaction (e.g., fails to deliver the goods **125** after the buyer **110** made the payment **115**), the buyer **110** files a claim (**360**) with the safe transaction service provider **130**. In other situations, the buyer **110** may file a claim merely based on a belief that the seller **120** has violated some agreed terms of the transaction. If the safe transaction service provider **130** determines that the seller **120** is at fault, it compensates (**370**) the buyer **110**. Subsequently, the safe transaction service provider **130** sends an indemnity request (**330**) to the seller **120** according to the transaction performance guaranty service agreement. Finally, the seller **120** indemnifies the safe transaction service provider **130** (**340**) in compliance with the service agreement.

FIG. 4 describes a buyer performance guaranty service model **400**, which provides a transaction performance guaranty to a party involved in a transaction as a buyer, according to an embodiment of the inventions. The buyer **110** subscribes to a buyer transaction performance guaranty service from the safe transaction provider **130**. The buyer **110** pays the safe transaction service provider **130** a service fee (**410**) for a transaction performance guaranty service for a specified term.

During the service term, when the buyer **110** enters a negotiation related to a transaction (e.g., bid on an auction item posted on the Internet or solicit sellers of a particular product), the buyer **110** registers the transaction (transaction bonding) (**420**) with the safe transaction service provider **130**. According to the transaction performance guaranty agreement with the buyer **110**, the safe transaction service provider **130** may generate a seal representing the performance guaranty provided on behalf of the buyer **110**. The seal may be shown to the seller **120** during negotiation or bidding process to indicate to the seller **120** that the buyer's performance is guaranteed. When the buyer **110** posts an advertisement to solicit sellers of particular goods, the seal may be incorporated into the advertisement to indicate a performance guaranty.

When the transaction is closed (e.g., the buyer **110** has selected a particular seller), the beneficiary of the buyer's performance guaranty is also determined (seller **120**). The safe transaction service provider **130** then accordingly binds the buyer's performance guaranty (**450**),to the transaction with the buyer **110**, issuing it to the seller **120** and notifying the seller **120** of the terms associated with the buyer's transaction performance guaranty. Alternatively, if the seller is known when the buyer enters the transaction negotiation process, the buyer's performance guaranty may also be bound at an earlier stage. For example, consider the case of a buyer **110** going to an auction site and bidding on a particular item. The seller is known from the start. In this case, the safe transaction service provider **130** may bind the performance guaranty to a transaction involving the parties at the time of the bidding.

Under a buyer's transaction performance guaranty, when the buyer **110** violates a term of the transaction (e.g., fails to make a payment **115** for the goods **125** received), the seller **110** files a claim (**460**) with the safe transaction service provider **130**. In other situations, the seller **120** may file a claim based on a belief that the buyer **110** has violated some terms of the transaction. If the safe transaction service provider **130** determines that the buyer **110** is at fault, it makes a payment (**470**) to compensate the seller **120**. Then, in compliance with the transaction performance guaranty service agreement with the buyer **110**, the safe transaction service provider **130** sends an indemnity request (**430**) to the buyer **110** for an amount computed according to the compensation made to the seller **120**. Finally, the buyer **110** indemnifies the safe transaction service provider **130** (**440**) according to the service agreement.

In the framework **100** depicted in FIG. **1**, the safe transaction service provider **130** determines service subscribers according to their qualifications measured using different approaches. In framework **100**, the safe transaction service provider **130** underwrites each applicant requesting different services. There may be a separate and distinct underwriter **140** involved in the process or the underwriter **140** may be part of the safe transaction service provider **130**.

The underwriter **140** may communicate with different entities to gather relevant information in order to make a qualification decision about each service applicant. It may gather credit information from different credit agencies **150**. It may also collect, either internally or externally, ratings of a merchant from various rating information sources **160**. In some situations, the underwriter **140** may also examine different governmental archives **170** to identify court proceedings in which an applicant is a party indicating the applicant's alleged or convicted wrongful conduct. Furthermore, the underwriter **140** may also look up data from other public information sources **180** that may reflect the qualification of an applicant. For instance, there may be a public list posted on a web site that lists all merchants who have participated in fraud in prior commercial activities. The underwriter may be a person, a corporation that carries out the underwriting process either manually or automatically through a computer application program or semi-automatically.

The safe transaction service provider **130** may choose to offer its service only to applicants who have shown a certain level of trustworthiness based on information collected from different sources. This minimizes the potential risk borne by the safe transaction service provider **130**. In an alternative embodiment, the safe transaction service provider **130** may also provide safe transaction related services on behalf of

**A-39**

US 7,644,019 B2

7

other business entities. For example, it may operate as an agency for an underwriter such as an insurance company. In addition, it may represent a plurality of independent business entities to offer, execute, and maintain safe transaction related services.

FIG. **5** depicts another embodiment of the inventions—a framework **500** in which the safe transaction service provider **130** provides transaction performance guaranty services on behalf of one or more independent underwriters (e.g., an underwriter **1** 140*a*, an underwriter **2** 140*b*, . . . , an underwriter n 140*c*). The safe transaction service provider **130** may not be an underwriter. It may have contractual agreements with different underwriters to interface, on behalf of the underwriters, with different service subscribers (the buyer **110** or the seller **120**) and service beneficiaries (the buyer **110** or the seller **120**) to process matters related to services offered by the underwriters.

The safe transaction service provider **130** may choose to represent certain underwriters in order to provide a specific range of services. Depending on the service an applicant requests, the safe transaction service provider **130** may direct the applicant to an appropriate service offered by a particular underwriter. In this case, the particular underwriter, which offers the appropriate service, may underwrite the applicant separately according to its own evaluation criteria.

In an alternative embodiment, while the safe transaction service provider **130** represents independent underwriters in offering services, the safe transaction service provider **130** may also operate as an underwriter. In this case, the services it offers may differ from services offered by other underwriters. Alternatively, the safe transaction service provider **130** may provide a service that is jointly offered with other underwriters. Furthermore, the safe transaction service provider **130** may also have joint business ventures with other business entities.

FIG. **6** depicts another embodiment of the inventions—a framework **600** in which the safe transaction service provider **130** may interact with a marketspace provider **610** in order to effectively facilitate a transaction performance guaranty service to parties involved in transactions posted in a marketspace provided by the marketspace provider **610**. In this embodiment, a transaction may be posted, negotiated, and carried out in a marketspace (not shown) run by the marketspace provider **610**. Examples of such a marketspace provider may be eBay, uBid, Amazon Auctions, or Yahoo Auctions.

To participate in a transaction in a marketspace, the seller **120** may register and post the transaction with the marketspace provider **610** for a paid period. Similarly, interested buyers (including the buyer **110**) may enter the marketspace to participate in different transactions. To effectively provide transaction performance guaranty services to participants of the transactions conducted in such a marketspace, the safe transaction service provider **130** may establish a business relationship with the marketspace provider **610**. Through such a business relationship, the safe transaction service provider **130** may directly assist its service subscribers in a marketspace where the subscribers conduct their businesses. For example, if there is a business cooperation between the safe transaction service provider **130** and the marketspace provider **610**, the safe transaction service provider **130** may incorporate a seal (indicating a performance guaranty) into a posted transaction at an appropriate location in the marketspace whenever a seller subscriber (who subscribes to a performance guaranty service) registers the transaction with the marketspace provider **610**.

8

Similarly, when a transaction is closed, the marketspace provider **610** may immediately provide the safe transaction service provider **130** with various types of information related to the closing so that a performance guaranty associated with the transaction may be carried out promptly. For instance, eBay, as a marketspace provider, may inform the safe transaction service provider **130**, at the closing of each auction, of the winner of the auction, the final closing price, and the contact information of the winner. With such information, the safe transaction service provider **130** may then promptly bind a seller's performance guaranty and send information related to the performance guaranty to the winner using the contact information provided by eBay.

In the framework **600**, the service subscribers and beneficiaries continue interfacing with the safe transaction service provider **130**. Direct communications are carried out to handle different business needs related to the transaction performance guaranty services. For example, the seller **120** may contact the safe transaction service provider **130** to obtain a service. The safe transaction service provider **130** may contact an auction winner regarding a performance guaranty service associated with the auction. In a different embodiment, services provided by (or through) the safe transaction service provider **130** may be offered directly through the marketspace provider **610**.

FIG. **7** depicts another embodiment of the inventions—a framework **700** in which the marketspace provider **610** provides a transaction performance guaranty service. The marketspace provider **610** offers a marketspace for buyers and sellers to conduct transactions (e.g., eBay). The marketspace provider **610** also provides transaction performance guaranty services to such participants. The marketspace provider **610** may offer such performance guaranty services on behalf of the independent safe transaction service provider **130** or jointly with the safe transaction service provider **130**, depending on the agreement between the marketspace provider **610** and the safe transaction service provider **130**.

The marketspace provider **610** may offer its own performance guaranty services. In this case, the safe transaction service provider **130** may be part of the marketspace provider **610** and supports its operations in the aspects of providing services that are peripheral to providing marketspaces. As an alternative, the marketspace provider **610** may offer transaction performance guaranty services from different providers, including its own services, services from the safe transaction service provider **130**, and services from other business entities.

Various embodiments discussed with reference to FIGS. **1-5** and combinations thereof are all applicable to the framework **600** and the framework **700**. In a particular business practice, a specific combination may be adopted and implemented according to the needs and arrangements called for in an application environment. The discussion below with reference to FIGS. **8-18** focuses on different aspects of the safe transaction service provider **130**. Particularly, FIGS. **8-11** depict the aspect of exemplary system construction of different parts of the safe transaction service provider **130**. FIGS. **12-18** show flows of different exemplary processes. The arrangements and processes shown in the figures and described herein are exemplary. One skilled in the art to which our claimed inventions pertain will appreciate that other constructions and flows may also be employed to achieve the same or similar functionalities and the equivalents thereof.

FIG. **8** depicts an exemplary internal structure of the safe transaction service provider **130** and its relations with other entities, according to an embodiment of the inventions. The

US 7,644,019 B2

9

safe transaction service provider **130** includes a service request routing mechanism **820**, a service application processing mechanism **830**, a transaction performance guaranty issuer **840**, and a claim processing mechanism **850**. The service request routing mechanism **820** is responsible for routing a received service request to an appropriate mechanism. For example, when a received request is to obtain a service (i.e., a service request **825**), the service request routing mechanism **820** may direct the request to the service application processing mechanism **830**. Details related to the service application processing mechanism **830** are discussed with reference to FIG. **9**. When a request is from a service subscriber to request the safe transaction service provider **130** to bind a performance guaranty to a particular transaction (i.e., a binding request **835**), the service request routing mechanism **820** may route the request to the transaction performance guaranty issuer **840**. Details related to the transaction performance guaranty issuer **840** are discussed with reference to FIG. **10**. Similarly, when a claim **845** is received, the claim is forwarded to the claim processing mechanism **850**. Details related to the claim processing mechanism **850** are discussed with reference to FIG. **11**.

The service request routing mechanism **820** may also serve as an interface between different mechanisms and the outside world. For instance, it may interface with a service subscriber **805** to request application information required by the service application processing mechanism **830**. When the service subscriber **805** requests the safe transaction service provider **130** to bind a particular transaction, the service request routing mechanism **820** may also collect from the subscriber information related to the transaction such as the location posted, the seal to be used, etc. Furthermore, when a service beneficiary **810** sends a claim, the service request routing mechanism **820** may also serve as an intermediate interface to assist the claim processing mechanism **850** to gather important evidence related to claimed default.

The communications between the safe transaction service provider **130** and the outside world may be conducted via a network **815**. The network **815** is a generic one, which may represent the Internet, a proprietary network, a virtual private network, a telephone network, a cable network, a wireless network, a local area network (LAN), a wide area network (WAN), or a combination thereof. Different parts of the safe transaction service provider **130** may interact with different outside entities. Such interaction may also go through a network (not shown).

As described with reference to FIG. **1**, the safe transaction service provider **130** may gather information from different sources (e.g., the credit agencies **150**, the rating information sources **160**, the governmental archives **170**, and the public information sources **180**) in order to underwrite a service applicant. The service application processing mechanism **830** is responsible for approving a service application and it may communicate with these information sources to gather useful information. The claim processing mechanism **850** is responsible for resolving claims received. When necessary, the claim processing mechanism **850** may interact with different outside entities to reach a resolution. Such outside entities involved in claim resolution include, but are not limited to, arbitration agencies **880**, collection agencies **870**, or courts **860**.

FIG. **9** shows an exemplary internal structure of the service application processing mechanism **830**, according to an embodiment of the inventions. The service application processing mechanism **830** includes an application information collection mechanism **920**, a pre-screening mechanism **930**, an underwriting mechanism **940**, an applicant validation mecha-

10

nism **950**, an account creation mechanism **960**, an authentication key generator **970**, and a service confirmation mechanism **980**. The service application processing mechanism **830** may also optionally include a storage **910** that stores information related to different forms of performance guaranty. A few exemplary forms in which a performance guaranty may be provided are illustrated in FIG. **2**.

The application information collection mechanism **920** may interact with a service applicant (or subscriber) **805** to gather information in order to approve the application. For instance, the application information collection mechanism **920** may ask the applicant to select a form in which the requested performance guaranty is preferably provided (e.g., the applicant may select a surety bond). Other information to be collected may include, but is not limited to, the preferred term of the service (e.g., 6 month term or one year term), the marketspace(s) where the applicant prefers to post transactions, etc. In addition, information related to the applicant may also be collected such as their social security number. Such information may be used in collecting other information such as a credit score in order to evaluate the applicant. The application information collection mechanism **920** may interact with the applicant directly or through the service routing mechanism **820**.

Information gathered by the application information collection mechanism **920** may be forwarded to different parts of the application processing mechanism so that different evaluations may be performed. The pre-screening mechanism **930** may be utilized for conducting a coarse level of screening. Such pre-screening may utilize information from different sources (as described with reference to FIG. **8**). For example, the pre-screening mechanism **920** may use internal ratings **935** for screening purposes. The internal ratings may be divided into individual ratings **935**a and benchmark ratings **935**b. The individual ratings **935**a may be computed over time, based on individual performances. The benchmark ratings **935**b may be computed over time, based on the aggregated performance of a group of individuals. For example, a benchmark rating may be computed across a population of business people or businesses that specialize in selling furniture.

The individual ratings **935**a and the benchmark ratings **935**b may be used separately or collectively by the pre-screening mechanism **930**. For instance, an individual rating may provide an absolute score reflecting the performance of the individual in comparison with, for example, the entire population. An individual rating may also be evaluated in light of a benchmark rating appropriate for the individual. For instance, if an applicant is a merchant who specializes in selling used cars on the Internet, his individual rating may be evaluated by comparing his individual rating with the benchmark rating derived from the population of a group of individuals who also specialize in selling used cars over the Internet. Further details related to pre-screening are described with reference to FIGS. **13** and **14**.

The underwriting mechanism **940** may be responsible for underwriting an applicant. The underwriting mechanism **940** may initiate an underwriting process only when the pre-screening yields a positive outcome. That is, if the pre-screening mechanism **930** determines that an applicant is not qualified, it may inform the underwriting mechanism **940** not to proceed with the underwriting operation.

If the underwriting mechanism **940** successfully underwrites an applicant, it may further trigger the applicant validation mechanism **950** to further validate the applicant. The validation process may include verifying the employment, the name, the address, and other relevant information associ-

US 7,644,019 B2

11

12

ated with the applicant. If the validation mechanism **950** fails to verify important information (e.g., home address), it may invalidate the applicant.

When the applicant is validated, the account creation mechanism **960** is invoked to create an account of the requested service for the applicant. In addition, the authentication key generator **970** is invoked to generate an authentication key to be used to authenticate anyone who claims to have the requested service. The created account and the generated authentication key are forwarded to the service confirmation mechanism **980**, which may store such information identifying the service associated with the applicant (or subscriber) in a customer information storage **990** and send a notification to the applicant with information related to the approved service. An exemplary process flow of the service application processing is shown with reference to FIG. **13**.

FIG. **10**(*a*) shows an exemplary internal structure of the transaction performance guaranty issuer **840**, according to an embodiment of the inventions. A transaction information acquisition mechanism **1000** may be responsible for gathering transaction related information from a service subscriber **805** who requests the safe transaction service provider **130** to bind a transaction performance guaranty to a specific transaction. This may include asking the service subscriber **805** to select, from a plurality of available choices of guaranty seals (**1005**), a preferred seal to be used to bind this transaction.

The transaction information acquisition mechanism **1000** may also gather information from the customer information storage **970** that is related to the service subscriber **805**. For instance, the service subscriber **805** may have specified a marketspace where all his transactions are to be posted. Such information may be useful in determining how a seal should be generated. For example, a certain marketspace may allow only HTML pages for posting a transaction. On the other hand, a different marketspace may require XML.

The transaction information acquisition mechanism **1000** may further register the transaction to be bound in a storage **1015** that stores all the transaction records. The registration is performed using the information collected. Some collected information is forwarded for further processing. For example, the subscriber's choice of seal is forwarded to a guaranty seal generation mechanism **1010** so that a desired seal can be generated. In addition, information related to the required platform of a marketspace where the seal is to be posted may also be forwarded to the guaranty seal generation mechanism **1010**.

A seal may be in a graphical form. To render a seal in its graphical form, the guaranty seal generation mechanism **1010** may produce code that can be use to render a graphical symbol. Such code may be generated in different forms. FIG. **10**(*b*) describes different exemplary forms in which code corresponding to a seal can be generated, according to an embodiment of the inventions. Code generated to render a seal **1020** may be generated as HTML code (**1025** and **1030**), XML code (**1035**), or code in other languages (**1040**) capable of rendering a graphical symbol. In general, code in any language that is capable of achieving the task suffices.

The generated HTML code (or XML code) may also be incorporate with an applet (e.g., a Java applet) that may be designed to perform certain tasks related to the bound transaction or transaction performance guaranty service after a seller and a buyer enter into the transaction. For example, such an applet may extract information related to the underlying transaction automatically from a marketspace. Such information may include, but is not limited to, the date that the transaction negotiation/bidding is closed, the number of days between the posting and the closing, the final price agreed, or

other terms consented by both parties. The applet may send extracted information back to the safe transaction service provider **130** to record such data for future use.

Such generated code may be incorporated into a posting of the registered transaction to render the seal. There may be different approaches that may be employed to incorporate the seal into a posting. FIG. **10**(*c*) describes different exemplary means for incorporating a seal **1050**. It may be incorporated manually (**1055**) or automatically (**1060**). When a manual approach is adopted, the generated code is provided to the subscriber and can then be pasted into the code used to post the registered transaction.

When an automatic approach is adopted, different automation modes may be further employed. To perform automatic incorporation, the safe transaction service provider **130** may be required to have direct access to the marketspace where the registered transaction is posted. In this case, the incorporation may be performed in a periodic check and post mode (**1065**), an implicit request driven mode (**1070**), or an explicit request driven mode (**1075**). In the periodic check and post mode **1065**, the safe transaction service provider **130** may periodically check, in the specified marketspace(s), whether a new transaction has been posted under each subscriber. The safe transaction service provider **130** incorporates a seal (e.g., pre-selected by the subscriber) to a new transaction whenever it determines that a new transaction has been posted since the last time. In this mode, the interval for the check may be set according to specific needs. For example, it can be every minute, every hour, every day, or every other day. The interval may also be set with respect to each subscriber. For a subscriber who posts transactions frequently, the interval may be shorter; for a subscriber who does not post transactions often, the interval maybe set longer.

In the implicit request driven mode **1070**, whenever a new transaction is posted, a subscriber may inform the safe transaction service provider **130** that there is a new transaction. This may be done without indicating which posted transaction is new (implicit). The safe transaction service provider **130** may keep track of all the transactions posted so far under each subscriber. Whenever such an indication is received, the safe transaction service provider **130** may simply check against its record to determine which transaction is newly posted and incorporate the seal accordingly.

In the explicit request driven mode **1075**, a subscriber may explicitly inform the safe transaction service provider **130** of each of the newly posted transactions for which a seal is to be incorporated.

FIG. **11** depicts an exemplary internal structure of the claim processing mechanism **850**, according to an embodiment of the inventions. The claim processing mechanism **850** comprises a claim information collection mechanism **1100**, a dispute resolution mechanism **1110**, a resolution execution mechanism **1140**, an indemnity processing mechanism **1170**, and an account suspension mechanism **1160**. The claim information collection mechanism **1100** may be responsible for gathering information related to a claim received from a service beneficiary **810**. Such information may be acquired from different parties. For example, from the service beneficiary **810**, the claim information collection mechanism may acquire information about the underlying transaction, agreed terms of the transaction, and the violation of a term based on which the claim is filed.

The claim information collection mechanism **1100** may also acquire relevant information from a marketspace provider **610** such as the dates the transaction is closed at the marketspace where the underlying transaction is posted. Relevant information may include the final terms at the closing of

**A-42**

US 7,644,019 B2

### 13

the transaction such as the final price for the goods recorded and some logged activities of the seller or the buyer before or after the closing.

The claim information collection mechanism **1100** may then forward the claim and collected information to the dispute resolution mechanism **1110** which may be responsible for determining a resolution regarding the claim. There is an optional communication forum **1120**, which may be used by the involved parties to communicate on issues raised in order to resolving the claim. For each claim, a separate forum may be set up with access rights to a limited group of parties, which may include the parties involved in the transaction, the personnel assigned to handle the claim, and any other party that may have insight into the issues involved. The forum set up for a particular claim may be implemented as a group bulletin board or a group mailbox.

Whenever the dispute resolution mechanism **1110** receives a claim and its relevant information, it may set up a corresponding communication forum designated to the claim. Initially collected data may be placed in the forum so that all parties involved can see what is claimed and on what ground. This may also include factual data collected from the marketspace where the transaction in dispute is posted. The dispute resolution mechanism **1110** may continuously monitor any incoming information placed in the communication forum. Evidence is collected in a continuous fashion and used in reaching a resolution.

The dispute resolution mechanism **1110** may also gather information from other sources. It may use information stored in the transaction records to, for example, verify some information supplied in the claim regarding the transaction. It may also check with service policies **1130** to determine, for example, the coverage of the subscriber involved in the transaction. Each subscriber may have a different coverage.

The dispute resolution mechanism **1110** may be manually operated, automatically operated, or semi-automatically operated. When the dispute resolution mechanism reaches a resolution, it informs the resolution execution mechanism **1140**, which is responsible for carrying out a claim resolution. If the resolution is in favor of the claimant, the resolution execution mechanism **1140** may generate a payment in an amount consistent with the resolution and send the payment to the claimant. The resolution execution mechanism **1140** may then invoke the indemnity processing mechanism **1170** to initiate a proceeding to seek indemnity from the subscriber involved. If the resolution is in favor of the subscriber (e.g., it is determined that no term of the transaction is violated), the resolution execution mechanism **1140** may clear the claim by informing the claimant. The claim records stored in **1150** may then be updated.

When a claim leads to an indemnity proceeding, the indemnity processing mechanism **1170** is activated. It may invoke the account suspension mechanism **1160** to suspend the account for the subscriber involved and to record the suspension in the customer information storage **970**. To seek indemnity from the subscriber, the indemnity processing mechanism **1170** may adopt one or more approaches. It may rely on an arbitration process conducted through arbitration agencies **880**. It may also seek indemnity through collection effort. Such collection may be performed internally, externally (through collection agencies **870**), or a combination of both (e.g., first conduct an internal collection for a predetermined period and then delegate the effort to an outside agency). The indemnity processing mechanism **1170** may also seek indemnity by bringing a legal action against the subscriber in a court

### 14

(**860**). Different methods of seeking indemnity may also be combined, applying different methods at different stages of the effort.

FIGS. **12-18** describe exemplary process flows corresponding to different aspects of the safe transaction service. FIG. **12** is a flowchart of an exemplary process, in which a transaction performance guaranty service is used to ensure a party's performance in a transaction, according to an embodiment of the inventions. A service request for a transaction performance guaranty is first received, at **1205**, from an applicant. To approve the requested service, the safe transaction service provider **130** (or an independent underwriter) underwrites, at **1210**, the applicant. Details related to the process of underwriting the applicant are discussed with reference to FIG. **13**. An applicant who is successfully approved obtains the requested transaction performance guaranty service and becomes a service subscriber. The service may be provided according to a service agreement with one or more terms.

Under the transaction performance guaranty service, for each transaction, the subscriber sends a transaction binding request to the service provider **130** to bind a transaction performance guaranty to the transaction. When the request is received, at **1215**, the safe transaction service provider **130** registers, at **1220**, the performance guaranty service to the registered transaction. This may include generating a seal to be incorporated into the posting of the transaction.

After the posted transaction is closed, at **1225**, the performance Guaranty is bound to the transaction at **1230**. Information related to the guaranty is sent to the beneficiary of the guaranty. If a claim is received from the beneficiary within the term of the guaranty, determined at **1235**, the claim is processed at **1250**. Otherwise, the claim is declined at **1240**. Before the service term expires, determined at **1245**, process returns to **1215** for the next transaction. Otherwise, the process ends at act **1255**.

FIG. **13** is a flowchart of an exemplary process, in which a service request is processed, according to an embodiment of the inventions. Information related to the applicant is first collected at **1305**. Pre-screening is performed at **1310**. The pre-screening may involve more specific operations.

FIG. **14** illustrates exemplary means used to perform pre-screening on the applicant as well as exemplary types of information used during pre-screening, according to an embodiment of the inventions. Pre-screening (**1410**) may be performed by carrying out a risk evaluation (**1420**), by collecting various scoring data (**1430**), through a random audit process (**1440**), or through a special review session (**1450**). Scoring data collected may be used for risk analysis, during the random audit or review session. As discussed earlier, the scoring data may include credit scores (**1480**), external experience ratings **1460**, or internal experience ratings **1470**. Experience ratings may further include individual ratings (**1480**$a$) or benchmarking ratings (**1480**$b$).

If pre-screening is unsatisfactory, determined at **1315**, the application is declined at **1320**. The applicant is notified, at **1325**, of the application status. If pre-screening is satisfactory, the safe transaction service provider **130** (or an independent underwriter or a marketplace provider) underwrites, at **1330**, the applicant. If it is successful, the safe transaction service provider **130** validates, at **1335**, the applicant.

When the applicant is not validated, determined at **1340**, the application is declined at **1320** and the applicant is notified at **1325**. If the applicant is validated, a service account is established at **1345** and an authentication key is generated at **1350**. The applicant is then notified, at **1325**, of the application status with account information and the authentication key provided.

**A-43**

US 7,644,019 B2

15

FIG. **15** is a flowchart of an exemplary process, in which the safe transaction service provider **130** binds a transaction performance guaranty to a transaction associated with a subscriber. The transaction is first registered at **1510**. This may include entering information related to the transaction such as the price listed. Based on the information registered, the safe transaction service provider **130** performs an exposure validation at **1520**. This may include examining the total amount of liability currently registered against the subscriber. If the registered liability exceeds a certain limit, the safe transaction service provider **130** may opt to deny the requested binding (not shown). The limit may be determined according to different criteria. For example, it could be a dollar amount. It may also be computed according to, for instance, the internal rating of the subscriber.

After the exposure validation, the safe transaction service provider **130** generates an authentication key at **1530** associated with this particular transaction. This is a second tier key. The first tier corresponds to an authentication key generated at the time the service is approved. The authentication key at the first tier (e.g., a private key) is connected only to the service and not to any specific transaction covered under the service. An authentication key at the second tier (e.g., a public key) is generated for a subscriber to identify each individual transaction. It is connected to a corresponding transaction under a specific subscriber. In order for the safe transaction service provider **130** to be able to distinguish individual transactions under each subscriber, two counterpart keys for each transaction may be generated. One is for the subscriber and the other is for the safe transaction service provider **130**.

To bind a performance guaranty to a transaction, a seal is generated. A subscriber may be allowed to select, at **1540**, a seal type to be generated before the seal is generated at **1550**. The generated seal is then incorporated, at **1560**, into the posting of the transaction to accomplish the binding. After the binding, the safe transaction service provider **130** registers, at **1570**, the liability associated with the bound transaction against the subscriber. The amount registered may be determined according to the listed price of the goods involved in the registered transaction. A timer may then be activated, at **1580**, to measure the duration of the transaction before it closes.

FIG. **16** is a flowchart of an exemplary process, in which a Transaction performance guaranty bound to a transaction is bound when the transaction is closed. Negotiation or bidding involving a registered transaction is first performed at **1610**. If the transaction is closed without a winner, determined at **1620**, the liability registered against the subscriber is removed at **1630**.

If the transaction is closed with a winner, the winner and the closing price are determined at **1640**. The contact information of the winner is then obtained, at **1650**, before the safe transaction service provider **130** sends, at **1660**, information related to the performance guaranty bound to the closed transaction to the winner. A timer is triggered, at **1670**, to start measuring the lapse of time against a term attached to the performance guaranty within which the winner may exercise the performance guaranty.

FIG. **17** is a flowchart of an exemplary process, in which a claim filed under a transaction performance guaranty is processed. The received claim is first analyzed at **1705**. Certain evidence may be collected, at **1710**, and used in analyzing seller's issues (at **1715**), buyer's issues (at **1720**), and issues related to a marketspace (at **1725**). The claimed violation of a transaction term is assessed at **1730** and such an assessment is reviewed at **1735**. If more evidence is needed to determine a resolution, determined at **1740**, the process returns to **1710** to

16

collect more evidence and perform more analysis based on newly collected evidence. This process repeats until there is enough evidence to enable a resolution determination made at **1745**. The resolution is then executed at **1750**.

FIG. **18** is a flowchart of an exemplary process, in which a claim resolution is executed. If it is determined that the service subscriber did not violate any term of the transaction, determined at **1800**, the claim is denied at **1810**. The liability registered against the service subscriber is removed at **1820**. The execution of the resolution is recorded at **1830**. The rating of the subscriber, if any, is then updated at **1840**. The update may be made according to different factors such as the degree of fault.

If the subscriber is at fault, compensation is made to the claimant at **1850**. Satisfaction of the claim is recorded at **1860**. The rating of the subscriber is then updated at **1870** according to, for example, the nature of the violation or the amount of compensation paid to the claimant or a combination of such related factors. The account of the subscriber may be suspended at **1880** (e.g., a decision as to whether the account is to be suspended may be made according to a service policy or terms of the service). A procedure seeking indemnity is then initiated at **1890**.

FIG. **19** is a flowchart of an exemplary service subscriber process. A request for obtaining a transaction performance guaranty service is first sent, at **1905**, to the safe transaction service provider **130**. When the application is approved, the subscriber receives, at **1910**, a confirmation or notification from the safe transaction service provider **130**.

Under the transaction performance guaranty service, the subscriber requests, at **1915**, the safe transaction service provider **130** to bind a performance guaranty to each individual transaction. To be bound, the subscriber first registers, at **1920**, the transaction. After registration, the subscriber receives, at **1925**, a seal (e.g., in HTML code) generated to indicate the requested binding. The seal is then incorporated, at **1930**, in the posted transaction.

The transaction may then be closed at **1935**. If there is a dispute as to whether the subscriber violates a term of the closed transaction, the subscriber may receive, at **1940**, a notification from the safe transaction service provider **130** regarding a claim filed against the subscriber. If the claim is resolved in favor of the claimant, the subscriber may further receive, at **1945**, a notification from the safe transaction service provider **130**, seeking indemnity. The subscriber then indemnifies, at **1950**, the safe transaction service provider **130**.

FIG. **20** is a flowchart of an exemplary service beneficiary process. A transaction with a performance guaranty service is first examined at **2010**. The service beneficiary enters, at **2020**, the transaction. When the transaction is closed out, the beneficiary receives, at **2030**, information related to the performance guaranty. When the other party involved in the transaction who is the subscriber of the performance guaranty, fails to perform according to the terms of the transaction, the beneficiary files, at **2040**, a claim against the subscriber with the safe transaction service provider **130**. Upon request, the beneficiary provides, at **2050**, information related to the subscriber's violation of the transaction term to the safe transaction service provider **130**. After the safe transaction service provider **130** reaches a claim resolution, the beneficiary is informed, at **2060**, about the resolution.

While the inventions have been described with reference to the certain illustrated embodiments, the words that have been used herein are words of description, rather than words of limitation. Changes may be made, within the purview of the appended claims, without departing from the scope and spirit

US 7,644,019 B2

17 18

of the invention in its aspects. Although the inventions have been described herein with reference to particular structures, acts, and materials, the invention is not to be limited to the particulars disclosed, but rather can be embodied in a wide variety of forms, some of which may be quite different from those of the disclosed embodiments, and extends to all equivalent structures, acts, and, materials, such as are within the scope of the appended claims.

We claim:

1. A method, comprising:

receiving, by at least one computer application program running on a computer of a safe transaction service provider, a request from a first party for obtaining a transaction performance guaranty service with respect to an online commercial transaction following closing of the online commercial transaction;

processing, by at least one computer application program running on the safe transaction service provider computer, the request by underwriting the first party in order to provide the transaction performance guaranty service to the first party,

wherein the computer of the safe transaction service provider offers, via a computer network, the transaction performance guaranty service that binds a transaction performance guaranty to the online commercial transaction involving the first party to guarantee the performance of the first party following closing of the online commercial transaction.

2. The method according to claim 1, wherein the transaction performance guaranty service provider is an underwriter.

3. The method according to claim 1, wherein the safe transaction service provider provides the transaction performance guaranty service on behalf of one or more independent underwriters.

4. The method according to claim 1, wherein the online commercial transaction is conducted at a marketspace provided by a marketspace provider.

5. The method according to claim 4, wherein the marketspace corresponds to an online marketspace.

6. The method according to claim 5, wherein the marketspace provider is an online auction marketspace provider.

7. The method according to claim 6, wherein the online auction marketspace provider is one of the following: eBay; uBid; Amazon Auctions; and Yahoo Auctions.

8. The method according to claim 4, wherein the transaction performance guaranty service is offered to the first party through the marketspace provider.

9. The method according to claim 4, wherein the transaction performance guaranty service is offered to the first party by the marketspace provider.

10. The method according to claim 1, wherein: the transaction performance guaranty enables a second party involved in an online commercial transaction with the first party to make a claim when the first party violates a term of the transaction, wherein the second party is a beneficiary of the transaction performance guaranty; and the first party becomes liable to the safe transaction service provider for an amount associated with a claim amount paid to the second party in case of the first party's failure to perform in compliance with a term of the transaction.

11. The method according to claim 10, wherein the first party is a service subscriber; and the second party is a service beneficiary.

12. The method according to claims 10, wherein the first party is one of: a seller in the online commercial transaction; and a buyer in the online commercial transaction.

13. The method according to claim 10, wherein the second party is one of: a buyer in the online commercial transaction; and a seller in the online commercial transaction.

14. The method according to claim 1,

wherein the transaction performance guaranty is provided in one form of: a surety bond; a specialized bank guaranty;

a specialized insurance policy; and a safe transaction guaranty provided by the safe transaction service provider.

15. The method according to claim 1, wherein said processing the request comprises:

collecting information relevant to applying the transaction performance guaranty service;

conducting pre-screening on the first party; underwriting the first party if the pre- screening is satisfactory;

validating the first party if said underwriting is successful;

establishing a service account if said validating is successful.

16. The method according to claim 15, wherein said pre-screening is performed by means of at least one of: a risk evaluation; a scoring data analysis; a random auditing; and a special review process.

17. The method according to claim 16, wherein the scoring data includes:

credit scores collected from one or more credit agencies;

rating scores accessible from one or more external rating agencies rating scores derived internally by the safe transaction service provider,

wherein the internal rating scores are computed based on at least one of:

individual ratings collected over time, and

benchmarking ratings evaluated based on a group of individuals.

18. The method according to claim 15, further comprising:

generating a first authentication key for the approved service provided to the first party after the service account is established; and

notifying the first party of the approved service request and the first authentication key.

19. The method according to claim 1, further comprising:

receiving, from the first party after a successful underwriting, a transaction binding request to bind, under the transaction performance guaranty service provided to the first party, a transaction performance guaranty to a specific online commercial transaction; and

binding, as a response to the binding request and following closing of the online commercial transaction, a transaction performance guaranty to the specific online commercial transaction.

20. The method according to claim 19, wherein prior to said binding, the method comprises:

registering, by the first party, the specific online commercial transaction with the safe transaction service provider; and

performing, by the safe transaction service provider, an exposure validation to determine the current total liability registered against the first party.

21. The method according to claim 20, wherein said registering comprises at least one of:

specifying an item involved in the specific transaction;

specifying a quantity of the item involved in the specific transaction;

indicating a unit price associated with the item; and describing a term related to the specific transaction.

22. The method according to claim 20, wherein the method further comprises:

US 7,644,019 B2

19

generating a second authentication key associated with the specific online commercial transaction involving the first party;

generating a seal that represents the bound transaction performance guaranty service for the specific online commercial transaction;

incorporating the seal into the posting of the specific online commercial transaction, indicating that there is a bound transaction performance guaranty service associated with the specific online commercial transaction; and

registering liability associated with the specific transaction against the first party.

23. The method according to claim 22, further comprising selecting the seal from a plurality of predetermined seal types.

24. The method according to claim 22, wherein said seal is generated in the form including at least one of: an HTML code; and an XML code.

25. The method according to claim 22, wherein said incorporating the seal is through at least one of:

a manual incorporation process, wherein the seal representation is sent to the first party and is manually inserted into the posting for the specific transaction;

an automatic incorporation process, wherein the automatic incorporation is achieved through at least one of:

a periodic check and posting operation conducted according to a predetermined interval;

an implicit request driven operation invoked by the first party whenever there is a new online commercial transaction is posted; and

an explicit request driven operation invoked by the first party with a specified online commercial transaction to which a seal is to be posted.

26. The method according to claim 22, further comprising activating a first timer for measuring the duration of the specific online transaction according to a term of the specific online transaction.

27. The method according to claim 22, further comprising closing the specific online transaction.

28. The method according to claim 27, wherein said closing comprises:

determining a winner who is to be involved in the final specific online transaction;

determining a total price of the specific online transaction if there is a winner;

sending information related to the transaction performance guaranty bound to the specific online transaction to the winner.

29. The claim according to claim 28, wherein the binding of the transaction performance guaranty to the specific online transaction comprises issuing the guaranty to the winner in a form selected by the first party to deliver the service; and

triggering a second timer for measuring the amount of time between the binding of the transaction performance guaranty and when a claim is received against a predetermined time period.

30. The method according to claim 28, further comprising removing the liability associated with the specific online transaction and registered against the first party when there is no winner.

31. The method according to claim 19, further comprising:

receiving a claim from a winner involved in the specific online transaction with the first party;

determining whether the claim is received within a predetermined time period measured from when the transaction performance guaranty was bound to the specific online transaction;

20

declining the claim if the claim is received after the predetermined time period; and

processing the claim if the claim is received within the predetermined time period.

32. The method according to claim 31, wherein said processing the claim comprises:

collecting information related to the claim;

analyzing issues related to the claim;

determining a dispute resolution according to the information collected and the results produced by said analyzing; and

carrying out the resolution determined.

33. The method according to claim 32, wherein the issues related to the claim include at least one of:

issues raised by the winner;

issues raised by the first party; and

issues related to a marketspace provider.

34. The method according to claim 32, wherein said carrying out the resolution comprises:

resolving the dispute in favor of the first party if it is determined that the first party does not violate a term of the specific online transaction;

resolving the dispute in favor of the winner if it is determined that the first party violates a term of the specific online transaction.

35. The method according to claim 34, wherein said resolving in favor of the first party comprises:

declining the claim made by the winner of the specific online transaction; and

removing the liability associated with the specific online transaction and registered against the first party.

36. The method according to claim 35, wherein said resolving in favor of the winner comprises:

making a payment to the winner in a claim amount; and

initiating a process seeking indemnity from the first party in compliance with the transaction performance guaranty service agreement with the first party.

37. The method according to claim 36, further comprising suspending the transaction performance guaranty service associated with the first party.

38. The method according to claim 34, further comprising updating a rating score associated with at least one of: the first party; and the winner.

39. A machine readable medium, encoded with instructions, that when executed by a machine, result in the following:

receiving, by at least one computer application running on a computer of a safe transaction service provider, a request from a first party for obtaining a transaction performance guaranty service with respect to an online commercial transaction;

processing, by at least one computer application running on the safe transaction service provider computer, the request by underwriting the first party in order to provide the transaction performance guaranty service to the first party,

wherein the safe transaction service provider computer offers, via computer network, the transaction performance guaranty service that binds a transaction performance guaranty to the online commercial transaction involving the first party to guarantee the performance of the first party in response to a closing of the online commercial transaction.

40. The medium according to claim 39, wherein:

the transaction performance guaranty enables a second party involved in an online commercial transaction with

**A-46**

US 7,644,019 B2

| 21 | 22 |

the first party to make a claim when the first party violates a term of the transaction,

wherein the second party is a beneficiary of the transaction performance guaranty; and

the first party becomes liable to the safe transaction service provider for an amount associated with a claim amount paid to the second party in case of the first party's failure to perform in compliance with a term of the transaction.

**41**. The medium according to claim **40**, wherein the first party is a service subscriber; and the second party is a service beneficiary.

**42**. The medium according to claims **40**, wherein the first party is one of: a seller in the online commercial transaction; and a buyer in the online commercial transaction.

**43**. The medium according to claim **40**, wherein the second party is one of:

a buyer in the online commercial transaction; and a seller in the online commercial transaction.

**44**. The medium according to claim **39**, wherein the transaction performance guaranty is provided in one form of:

a surety bond;

a specialized bank guaranty;

a specialized insurance policy; and

a safe transaction guaranty provided by the safe transaction service provider.

**45**. The medium according to claim **39**, wherein said processing the request comprises:

collecting information relevant to applying the transaction performance guaranty service;

conducting pre-screening on the first party;

underwriting the first party if the pre-screening is satisfactory;

validating the first party if said underwriting is successful; and

establishing a service account if said validating is successful.

**46**. The medium according to claim **39**, the instructions, when executed by a machine, further result in:

receiving, from the first party after a successful underwriting, a transaction binding request to bind, under the transaction performance guaranty service provided to the first party, a transaction performance guaranty to a specific online commercial transaction; and

binding, as a response to the binding request and following closing of the specific online commercial transaction, a transaction performance guaranty to the specific online commercial transaction.

**47**. The medium according to claim **46**, wherein prior to the binding, the instructions, when executed by a machine, further result in:

registering, by the first party, the specific online commercial transaction with the safe transaction service provider; and

performing, by the safe transaction service provider, an exposure validation to determine the current total liability registered against the first party.

**48**. The medium according to claim **47**, wherein the instructions, when executed by a machine further result in:

generating a second authentication key associated with the specific online commercial transaction involving the first party;

generating a seal that represents the transaction performance guaranty service for the specific online commercial transaction;

incorporating the seal into the posting of the specific online commercial transaction, indicating that there is a bound transaction performance guaranty service associated with the specific online commercial transaction; and

registering liability associated with the specific transaction against the first party.

**49**. The medium according to claim **39**, further comprising closing the specific online transaction, which comprises:

determining a winner who is to be involved in the final specific online transaction;

determining a total price of the specific online transaction if there is a winner;

sending information related to the transaction performance guaranty bound to the specific online transaction to the winner.

**50**. The medium according to claim **49**, wherein the binding of the transaction performance guaranty comprises issuing the guaranty to the winner in a form selected by the first party to deliver the service; and

triggering a second timer for measuring the amount of time between the binding of the transaction performance guaranty and when a claim is received against a predetermined time period.

**51**. The medium according to claim **50**, further comprising:

receiving a claim from a winner involved in the specific online transaction with the first party;

determining whether the claim is received within a predetermined time period measured from when the transaction performance guaranty was bound to the specific online transaction;

declining the claim if the claim is received after the predetermined time period; and

processing the claim if the claim is received within the predetermined time period.

**52**. The medium according to claim **51**, wherein said processing the claim comprises:

collecting information related to the claim;

analyzing issues related to the claim;

determining a dispute resolution according to the information collected and the results produced by said analyzing; and

carrying out the resolution determined.

\* \* \* \* \*

# CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of October, 2013, the foregoing was filed electronically with the U.S. Court of Appeals for the Federal Circuit by means of the Court's CM/ECF system. I further certify that the foregoing was served on the counsel of record, by means of electronic mail.

                                              Respectfully submitted,

Dated:   October 21, 2013


                                              /s/ Stephen M. Hankins
                                              Stephen M. Hankins

## CERTIFICATE OF COMPLIANCE

Counsel for appellants certifies that the brief contained herein has a proportionally spaced 14-point typeface, and contains 6,207 words, based on the "Word Count" feature of Microsoft Word, including footnotes and endnotes.

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), this word count does not include the words contained in the Certificate of Attorneys, Certificate of Service, Table of Contents, Table of Authorities, Addendum, and Statement of Related Cases.

Dated:  October 21, 2013                    Respectfully submitted,


_/s/ Stephen M. Hankins_
Stephen M. Hankins