**2013-1575**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

BUYSAFE, INC.,

*Plaintiff – Appellant*,

v.

GOOGLE, INC.,

*Defendant – Appellee.*

Appeal from the United States District Court
for the District of Delaware, Case No. 11-cv-1282
Judge Leonard P. Stark

## CORRECTED BRIEF FOR DEFENDANT –
## APPELLEE GOOGLE, INC.

A. John P. Mancini
Allison Levine Stillman
MAYER BROWN LLP
1675 Broadway
New York, NY 10019
(212) 506-2500

Andrew J. Pincus
Brian A. Rosenthal
Ann Marie Duffy
Paul W. Hughes
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-3000

December 9, 2013

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, Andrew J. Pincus, counsel for defendant-appellee Google Inc., certifies the following:

1.     The full name of the party represented by me is:

Google Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Not applicable.

3.     All parent corporations or any publicly held corporations that own 10% or more of the stock of Google Inc.:

Google Inc. is a publicly traded company. No publicly held corporation owns 10% or more of Google stock.

4.     The names of all law firms and the partners or associates that appeared for the party now represented by me in this proceeding are:

MAYER BROWN LLP
A. John P. Mancini
Andrew J. Pincus
Brian A. Rosenthal
Ann Marie Duffy
Allison Levine Stillman
Paul W. Hughes

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld
Paul Saindon

/s/ Andrew J. Pincus

December 9, 2013                    Andrew J. Pincus

i

# TABLE OF CONTENTS

Certificate of Interest ................................................................ i

Table of Authorities ................................................................ iii

Statement of Related Cases ...................................................... v

Issues To Be Decided ............................................................... 1

Statement of the Case ............................................................... 1

Statement of Facts .................................................................... 2

    A.  The Idea of Transaction Performance Guarantees. .......................... 2

    B.  The Asserted Patent Claims. ........................................... 5

    C.  The Prosecution History of the '019 Patent. ................... 8

    D.  The Proceedings Below. ................................................ 8

Summary of the Argument ....................................................... 13

Argument .................................................................................. 16

I.   The Relevant Claims Are Not Patent Eligible. ..................... 16

    A.  buySAFE concedes that the claims turn on an abstract
        idea. ............................................................................ 19

    B.  buySAFE's asserted limitations do not salvage the claims. ........... 21

        1.  The "Internet" limitation. ......................................... 22

        2.  The "computer" limitation. ....................................... 25

            a.  The "computer" limitation is not integral to the
               asserted claims. ................................................ 27

            b.  The asserted claims do not disclose "specific"
               computer "components" or "algorithms." ............. 31

            c.  Dealertrack and CyberSource foreclose
               buySAFE's argument. ....................................... 35

        3.  The "temporal" limitation. ........................................ 40

        4.  The combination of asserted steps. ........................... 45

    C.  The machine-or-transformation test confirms that the
        claims are unpatentable. ............................................. 46

    D.  The claims are also patent ineligible under *CLS*. ........... 50

II.  No Judgment Has Been Entered With Respect To The Claim
    Construction Order. .................................................... 57

Conclusion ............................................................................... 58

# TABLE OF AUTHORITIES

## CASES

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.,*
   728 F.3d 1336 (Fed. Cir. 2013) ...................................................... *passim*

*In re Alappat,*
   33 F.3d 1526 (Fed. Cir. 1994) ........................................................... 49, 50

*Bancorp Servs., L.L.C. v. Sun Life Assurance Co.,*
   687 F.3d 1266 (Fed. Cir. 2012) ...................................................... *passim*

*Bilski v. Kappos,*
   130 S. Ct. 3218 (2010) ..................................................................... *passim*

*CLS Bank International v. Alice Corp. Pty. Ltd.,*
   717 F.3d 1269 (Fed. Cir. 2013) ...................................................... *passim*

*CyberSource Corp. v. Retail Decisions, Inc.,*
   654 F.3d 1366 (Fed. Cir. 2011) ...................................................... *passim*

*Dealertrack, Inc. v. Huber,*
   674 F.3d 1315 (Fed. Cir. 2012) ...................................................... *passim*

*Diamond v. Diehr,*
   450 U.S. 175 (1981) ......................................................................... *passim*

*Fort Props., Inc. v. Am. Master Lease LLC,*
   671 F.3d 1317 (Fed. Cir. 2012) ........................................................ 26, 30

*Gottschalk v. Benson,*
   409 U.S. 63 (1972) ................................................................................... 37

*Mass. Inst. of Tech. & Elecs. For Imaging, Inc.
   v. Abacus Software,*
   462 F.3d 1344 (Fed. Cir. 2006) ............................................................. 58

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.,*
   132 S. Ct. 1289 (2012) ..................................................................... *passim*

*Organic Seed Growers & Trade Ass'n v. Monsanto Co.,*
   718 F.3d 1350 (Fed. Cir. 2013) ............................................................. 20

*Parker v. Flook,*
   437 U.S. 584 (1978) ................................................................. 18, 44, 55

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Redhead v. Cator,*
   1 Starkie 14, 171 Eng. Rep. 387 (Ct. Assize 1815) ................................... 4

*Research Corp. Technologies, Inc. v. Microsoft Corp.,*
   627 F.3d 859 (Fed. Cir. 2010) ....................................................... 37, 38, 40

*Sadler v. Johnson,*
   [1847] 153 Eng. Rep. 1403, 16 M. & W. 775
   (Ct. of Exchequer) ............................................................................... 4

*SanDisk Corp. v. Kingston Tech. Co.,*
   695 F.3d 1348 (Fed. Cir. 2012) ........................................................... 57

*SiRF Technology, Inc. v. International Trade Commission,*
   601 F.3d 1319 (Fed. Cir. 2010) .................................................. 38, 39, 40

*Sorby v. Gordon,*
   June 20, 1874 Law Times 528 (Ct. of Exchequer) .................................... 4

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.,*
   897 F.2d 511 (Fed. Cir. 1990) ................................................................ 30

*Ultramercial, Inc. v. Hulu, LLC,*
   722 F.3d 1335 (Fed. Cir. 2013) ........................................................ 39, 40

**OTHER AUTHORITIES**

Henry Anselm De Colyar, *A Treatise on the Law of Guarantees
   & of Principal & Surety* 1 (2d ed. 1896) ................................................. 2

R.H. Helmholz, *Magna Carta and the Ius Commune,* 66 U. Chi.
   L. Rev. 297 (1999) ................................................................................ 3

Restatement (Third) of Suretyship & Guaranty  (1996) .......................... 2, 4

William Theobald, *A Practical Treatise on the Law of Principal &
   Surety Particularly with Relation to Mercantile Guaranties* (1832) ....... 4

Willis D. Morgan, *The History and Economics of Suretyship,*
   12 Cornell L.Q. 153 (1927) ..................................................................... 3

**STATEMENT OF RELATED CASES**

No appeal from this civil action was previously before this Court or any other appellate court.

A recently-filed case, *buySAFE, Inc. v. Google, Inc.*, No. 3:13-cv-00781-HEH (E.D. Va.), may be directly affected by this appeal.

## ISSUES TO BE DECIDED

Whether the district court correctly held that claims 1, 14, 39, and 44 of U.S. Patent No. 7,644,019 ("the '019 Patent"), which implement via the Internet the abstract idea of using a third-party surety in commercial transactions, are drawn to subject matter that is not patent eligible under 35 U.S.C. § 101.

## STATEMENT OF THE CASE

buySAFE sued Google on December 22, 2011, alleging that the "Google Trusted Stores" program infringes the '019 Patent. Compl., Dkt. No. 1, 11-cv-1282. Google answered the complaint. Dkt. No. 7.

On July 6, 2012, buySAFE and Google entered a joint stipulation limiting the case to four claims of the '019 Patent: claims 1, 14, 39, and 44. Dkt. No. 30. After the parties briefed claim construction (Dkt. Nos. 38, 39, 43, 44), the district court held a *Markman* hearing on October 26, 2012. It later entered an opinion and order construing claim terms that the parties had disputed. A48-A58 (the "*Markman* Ruling").

Additionally, on July 9, 2012, Google filed a motion for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c), contending that the relevant claims of the '019 Patent are invalid under 35 U.S.C. § 101. Dkt. No. 31 (the "Rule 12(c) Motion"). After this Court issued its *en*

*banc* decision in *CLS Bank International v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269 (Fed. Cir. 2013), the district court invited supplemental briefing. *See* Dkt. Nos. 59, 60. Subsequently, the district court granted Google's motion, concluding that the relevant claims "are not eligible for patent protection under 35 U.S.C. § 101." A12.

The district court entered its judgment on August 19, 2013. A1.

## STATEMENT OF FACTS

### A. The Idea of Transaction Performance Guarantees.

The '019 Patent describes a method for providing "a transaction performance guaranty service." A13. A transaction performance guaranty is a suretyship—a third party's guarantee of some aspect of an underlying agreement. *See* Restatement (Third) of Suretyship & Guaranty § 1 (1996). A suretyship generally has three parties: (1) a beneficiary, (2) a principal obligor, and (3) a surety, or secondary obligor, who guarantees that the principal obligor will perform. *Id.*

A surety is an abstract concept often used in commerce. It "is of very ancient date, and appears, indeed, to be 'coeval with the first contracts recorded in history.'" Henry Anselm De Colyar, *A Treatise on the Law of Guarantees & of Principal & Surety* 1 (2d ed. 1896) (quoting Story on the Law of Contracts 319 (5th ed.)). A tablet dated to approximately 2750 B.C.,

2

from the Library of Sargon I, King of Accad and Sumer, is perhaps the first recorded suretyship. *See* Willis D. Morgan*, The History and Economics of Suretyship*, 12 Cornell L.Q. 153 (1927). One farmer, who was heading off to war, entered into an agreement with another farmer who would cultivate his crops and share the harvest; a merchant guaranteed the performance of the lessee. *Id*.[1]

The concept of suretyship was later codified around 1750 B.C. in the Code of Hammurabi. Morgan, *supra*, at 153-55. The Old Testament warned against becoming a surety. *See*, *e.g.*, Proverbs 11:15 ("[w]hoever puts up security for a stranger will surely suffer"). Chapter 9 of the Magna Carta established rights for sureties. *See* R.H. Helmholz, *Magna Carta and the Ius Commune*, 66 U. Chi. L. Rev. 297, 318 (1999). And Antonio's surety to Shylock is the central plot device of *The Merchant of Venice*.

Transaction performance guarantees were a fundamental element of the mercantilist economy of the 17th and 18th centuries, where third par-

---

[1] This is not lost on buySAFE. A prior version of its website explained that "the surety bond concept was born" "in about the year 2750 BC" as "a simple three-way agreement between a king, a young farmer, and a local spice merchant." *See* http://tinyurl.com/jwgotok (Internet archive). buySAFE explained that "[s]urety bonds have been used for thousands of years to guarantee business transactions involving buyers and sellers who don't know each other" and further that "[s]urety bonding still works in the same way as it did almost 50 centuries ago." *Id*.; *see also* A79-A81 (argument regarding buySAFE's website).

ties guaranteed the performance of buyers and sellers of goods, who often were strangers located continents apart. *See* William Theobald, *A Practical Treatise on the Law of Principal & Surety Particularly with Relation to Mercantile Guaranties* (1832). For example, when English buyers purchased a large quantity of hemp from Russian merchants residing in Riga, William Cator guaranteed the merchants' performance. *Redhead v. Cator*, [1815] 1 Starkie 14, 171 Eng. Rep. 387 (Ct. Assize). After the merchants failed to deliver as promised, the purchasers sued Cator and prevailed. *Id.* at 388-89; *see also Sorby v. Gordon*, June 20, 1874 Law Times 528 (Ct. of Exchequer) (guaranty for goods shipped from England to India); *Sadler v. Johnson*, [1847] 153 Eng. Rep. 1403, 16 M. & W. 775 (Ct. of Exchequer) (same).

A suretyship is often created *after* the formation of the underlying contract. *See, e.g.*, Restatement (Third) of Suretyship & Guaranty § 9(2)(a) (discussing "the underlying obligation" and "the *later* creation of the secondary obligation" (emphasis added)); Theobald, *supra*, at 8 (discussing circumstances where "a person accedes as surety to an existing agreement, or guaranties an existing debt"). Other times, however, a surety may be created before or simultaneous with the underlying agreement. The very

4

nature of a surety requires that the surety's obligations must become binding at some point before, during, or after the underlying contract.

## B. The Asserted Patent Claims.

In this case, buySAFE asserts claims 1, 14, 39, and 44 of the '019 Patent, which provide a method for guaranteeing online transactions. A45. Figure 1 is exemplary of one of the embodiments:



**Fig. 1**

As shown, the patent contemplates three parties: a Buyer (110), a Seller (120), and a Safe Transaction Service Provider (130). The underlying transaction is between the Buyer and Seller. A38 (col. 3:33-34). According to the specification, either the Buyer or the Seller may request a performance guaranty service from the Safe Transaction Service Provider. *Id.*

(col. 3:44-49). If the guaranteed party defaults in the underlying transaction (*e.g.*, the Seller fails to deliver the goods as promised), the guaranty is exercised. *Id.* (col. 3:57-64).

The specification sets forth the method by which the transaction performance guaranty is obtained, which is the subject of the claims. The Safe Transaction Service Provider "underwrites each applicant requesting different services." A39 (col. 6:38-42). The specification explicitly notes that the "underwriting" process performed by the Safe Transaction Service Provider can be done *manually*: "[t]he underwriter may be a person, a corporation that carries out the underwriting process either manually or automatically through a computer application program or semiautomatically." *Id.* (col. 6:57-60).

The first asserted claim, claim 1, contains just three steps:

A method, comprising:

receiving, by at least one computer application program running on a computer of a safe transaction service provider, a request from a first party for obtaining a transaction performance guaranty service with respect to an online commercial transaction following closing of the online commercial transaction;

processing, by at least one computer application program running on the safe transaction service provider computer, the request by underwriting the first party in order to provide the transaction performance guaranty service to the first party,

6

wherein the computer of the safe transaction service provider offers, via a computer network, the transaction performance guaranty service that binds a transaction performance guaranty to the online commercial transaction involving the first party to guarantee the performance of the first party following closing of the online commercial transaction.

A45.

Accordingly, those three steps are: (1) *receiving*—a party to an online transaction sends a request for a guaranty to the computer of a third-party surety (*i.e.*, the Safe Transaction Service Provider); (2) *processing* by underwriting—the Surety's computer decides whether to provide the guaranty; (3) *binding*—if the Surety's computer decides to provide the guaranty, it binds the guaranty after the transaction closes.

Independent claim 39 is substantively similar, but it claims a machine readable medium that performs the claimed method. A46. Below, buySAFE conceded that any differences between claims 1 and 39 "are not germane." Dkt. No. 40, at 2 (quotation omitted).

Claims 14 and 44 are dependent claims; buySAFE did not below, and does not here, point to any features of these dependent claims that are relevant to the Section 101 analysis. The district court noted that buySAFE "did not rely on any element of claims 14 and 44 that is absent from the corresponding independent claims." A11 n.4.

## C.    The Prosecution History of the '019 Patent.

The original patent application did *not* require the use of a computer, nor did it purport to limit the time at which the performance guaranty would bind to the underlying agreement. *See*, *e.g.*, A230.[2] The applicant added the asserted temporal limitation well after the initial application. A586. And, in 2009, six years after the application, the examiner recommended "language to avoid a possible 101 rejection for the proposed amendments to the claims." A616. Only after this recommendation, made during an interview after a final rejection of the application, did buySAFE amend its claims to add the terms "computer," "computer network," and "computer application program." A617; buySAFE Br. 8. Four months later, the Patent Office issued a Notice of Allowance. A702.

## D.    The Proceedings Below.

buySAFE sued Google (Dkt. No. 1), and Google answered the complaint (Dkt. No. 7). The parties entered a joint stipulation regarding claim construction. Dkt. No. 30. Google also moved for judgment on the pleadings pursuant to Rule 12(c), contending that the relevant claims are drawn to unpatentable subject matter under 35 U.S.C. § 101. Dkt. No. 31.

---

[2]    buySAFE attempts to characterize its amendments as "clarify[ing] the computer implementation" (buySAFE Br. 8), but the original application contained no computer limitation whatsoever.

The district court held a *Markman* hearing and thereafter entered an order construing the claim terms in dispute. Simultaneously, the district court granted Google's Rule 12(c) motion.

### 1. Claim construction.

In its *Markman* Ruling, the district court considered the scope of the terms "transaction performance guaranty" and "guaranty" together, finding that "[t]he issues raised by both terms are the same." A53. The district court adopted buySAFE's proposed construction: it construed a "transaction performance guaranty" to mean "protection associated with performing some or all of the terms of a purchase." *Id.* It similarly construed "guaranty" to mean "protection associated with some or all of the terms of an agreement." *Id.*

The dispute between the parties was the breadth of the term "guaranty." Google argued that, because the '019 Patent "specification distinguishes a 'guaranty' from other forms of protection, such as an escrow or a performance bond," the term should be narrowly construed to exclude these other types of protection that could be used. A55. Google thus argued that the term should be defined as "an irrevocable promise to fulfill another's obligation." A53.

buySAFE strongly disagreed, arguing that the meaning of "guaranty" has a "broad scope," which would include several different kinds of protection like "a surety bond; a specialized bank guaranty; a specialized insurance policy; and a safe transaction guaranty provided by the safe transaction provider." Plaintiff buySAFE's Opening Claim Construction Br. 9, Dkt. No. 39. buySAFE specifically objected to what it characterized as Google's efforts to "improperly import[] limitations into the claims from the specification." *Id*. (capitalization omitted).

Likewise, in its reply brief, buySAFE reiterated that the term "guaranty" should have a "much broader construction" than that urged by Google. Dkt. No. 44, at 7. In its view, the concept of a "transaction performance guaranty" reaches even beyond "the financial and banking context." *Id*. Accordingly, "lowest price guaranties" and an "in store guaranty" are, in buySAFE's view, claimed by the terms of the '019 Patent. *Id*.

The district court agreed with buySAFE and construed the terms "guaranty" and "transaction performance guaranty" broadly. It concluded that the term "guaranty" is not limited to a specific kind of protection, but also includes concepts "such as an escrow or performance bond." A55.

The district court also construed the term "underwriting" and adopted the construction agreed to by buySAFE at the *Markman* hearing. A55.

10

It concluded that "underwriting" means "a process to determine whether to guaranty a transaction." *Id*.

## 2. Judgment on the pleadings.

Next, the district court granted Google's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). A2-A12. It specifically noted that its "claim construction ruling * * * has no impact on Defendant's Rule 12(c) motion." A4 n.1.

The district court concluded that "the '019 patent is directed to an abstract—and, therefore, unpatentable—process of underwriting commercial transactions by a third party to guarantee performance." A11-A12. At bottom, "[a]llowing Plaintiff to patent the general concept of performance guaranties would effectively grant a monopoly over an abstract idea." A12.

The district court rejected buySAFE's arguments that the claimed computer limitations provided any basis to render the claims patentable. It found that the claims related to processes that can—and in fact are— performed in the same fashion without computers; "[t]he '019 patent, on its face, explains that the entire inventive process can be performed by a human." A8. Moreover, "the claims are directed to a method that just happens to be performed by a computer." A11.

In support of this conclusion, the district court quoted a portion of the specification; it explained that "'the underwriting may be *a person*, a corporation that *carries out the underwriting process* either *manually* or automatically through a computer application program or semi-automatically.'" A8. It also noted buySAFE's admission at the motion hearing that, "'if the transaction was not online,' each of the steps 'could be conducted without a computer.'" *Id.*

Accordingly, the district court found that "[t]he '019 patent describes a well-known, and widely-understood concept—a third party guarantee for a sales transaction—and then applies that concept using conventional computer technology and the Internet." A9. "Merely using a computer to perform more efficiently what could otherwise be accomplished manually does not confer patent-eligibility." *Id.*

The district court also found that buySAFE's "temporal limitation" cannot transform the abstract idea into something that is patentable. A10. It explained that "the claim is directed to the concept of guaranteeing the performance of a transaction after that transaction is closed." *Id.* "This is not sufficient to transform an unpatentable abstract idea into a patent eligible application of the idea." *Id.*

In its briefing before the district court, buySAFE relied heavily on the panel's decision in *CLS*, arguing that its claims were the "same type of claims" as those at issue in *CLS*. Dkt. No. 40, at 1. The district court noted that, while it "would have found the claims patent-ineligible" "even under the reasoning of the *CLS* panel," the "*en banc* decision in *CLS*" made Google's argument "even stronger." A11.

The district court subsequently entered judgment in favor of Google with respect to the Rule 12(c) motion. A1.

## SUMMARY OF THE ARGUMENT

A patent may not claim—and thus preempt the use of—laws of nature, physical phenomena, or abstract ideas. There is no dispute that an abstract idea lies at the heart of buySAFE's asserted claims; buySAFE concedes that "the generalized idea of a transaction performance guaranty" is an "example" of an "abstract idea." buySAFE Br. 11.

A patent claim that turns on an abstract idea is eligible for patent protection only if it contains additional elements that do "significantly more" than implement the abstract idea. *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012). The Supreme Court has held that certain categories of limitations cannot satisfy this test. For example, "the prohibition against patenting abstract ideas 'cannot be cir-

cumvented by attempting to limit the use of the formula to a particular technological environment' or adding 'insignificant postsolution activity.'" *Bilski v. Kappos*, 130 S. Ct. 3218, 3230 (2010) (quoting *Diamond v. Diehr*, 450 U.S. 175, 191-92 (1981)). Likewise, "well-understood, routine, [or] conventional activity" will not render a claim eligible for patent protection. *Mayo*, 132 S. Ct. at 1294.

buySAFE asserts that its claims have three limitations: the claims require implementation via a computer network, such as the Internet (the "Internet" limitation); the claims require a computer (the "computer" limitation); and the claims require the binding of a performance guaranty after the closing of the underlying transaction (the "temporal" limitation). But these asserted limitations do not—either individually or in combination—disguise the reality that the '019 patent is invalid because it claims the abstract idea of third-party suretyship.

As to the Internet and computer limitations, this Court has repeatedly rejected the view that simply limiting an idea to an online or computer application is enough to render it patentable. buySAFE's asserted "temporal" limitation is no limitation at all, because it is merely part of the abstract idea itself. And, in addition, it certainly is nothing beyond a "con-

ventional" step. This limitation therefore cannot save the patent from invalidity under Section 101.

Perhaps recognizing that its claims as drafted are not eligible for patent protection, buySAFE grossly mischaracterizes their content. On repeated occasions—starting with its framing of the issue presented for review—buySAFE asserts that its claims require the use of "specific" computer equipment or disclose a particular "algorithm." *See*, *e.g.*, buySAFE Br. 3 ("specific machine"); *id.* at 4 ("specific computer-application based methods and media"); *id.* at 12 ("a computer programmed to perform specific algorithms"); *id.* at 18, 26, 30, 32.

This is a severe distortion of the asserted claims. Neither the asserted claims nor the specification disclose any algorithm, nor do they require a specific computer component. All that buySAFE's claims require is the use of a general purpose computer performing ordinary processing operations.

The district court correctly concluded that the claims asserted in this case are not drawn to patent eligible subject matter under Section 101.

## ARGUMENT

### I. The Relevant Claims Are Not Patent Eligible.

The Supreme Court has long held that Section 101, which "defines the subject matter that may be patented under the Patent Act," excludes "laws of nature, physical phenomena, and abstract ideas." *Bilski*, 130 S. Ct. at 3225 (quotation omitted). These concepts are not eligible for patent protection because they "are part of the storehouse of knowledge of all men[,] free to all men and reserved exclusively to none." *Id.* (quotation & alterations omitted). "Monopolization" of these "'basic tools of scientific and technological work" through the grant of a patent "might tend to impede innovation more than it would tend to promote it." *Mayo*, 132 S. Ct. at 1293 (quotation omitted). Section 101 is therefore "a threshold test" for patent eligibility. *Bilski*, 130 S. Ct. at 3225.

When a patent claim involves a law of nature, physical phenomena, or abstract idea, it must "contain other elements or a combination of elements, sometimes referred to as an 'inventive concept,' sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the" law, phenomena, or idea. *Mayo*, 132 S. Ct. at 1294. If the additional features "add nothing of significance," the claim is not eligible for patent protection. *Id.* at 1302. And dressing up an abstract idea in a series

of steps and labeling it a "process" does not alter this critical requirement. *Bilski*, 130 S. Ct. at 3230-31.

Here, buySAFE concedes that the fundamental element of the '019 Patent—the idea of a "transaction performance guaranty"—is an "abstract concept." buySAFE Br. 16. Accordingly, the sole question is whether the relevant claims "add *enough*" to that abstract idea to make them patentable. *Mayo*, 132 S. Ct. at 1297. The Supreme Court has set forth several guideposts for this analysis, which are designed to prevent "patent eligibility" from "'depend[ing] simply on the draftsman's art.'" *Id.* at 1294.

*First*, "the 'prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use * * * to a particular technological environment.'" *Mayo*, 132 S. Ct. at 1297 (quoting *Bilski*, 130 S. Ct. at 3230); *see also Bilski*, 130 S. Ct. at 3231 ("limiting an abstract idea to one field of use" cannot transform the idea into something patentable). This is because to be patentable under Section 101, a claim must "*add*" something to an abstract idea. *Mayo*, 132 S. Ct. at 1297 (emphasis added). Simply *reducing* the application of an abstract idea to a particular application or environment does not *add* anything to it.

*Second*, insignificant additions must be disregarded. A claim that adds merely "well-understood," "routine," or "conventional activity" cannot

make an abstract idea patentable under Section 101. *Mayo*, 132 S. Ct. at 1294.[3] Likewise, "adding token postsolution components" does not render an abstract idea patentable. *Bilski*, 130 S. Ct. at 3231.

*Third*, whether a patent claim satisfies the "'machine-or-transformation' test is an 'important and useful clue' to patentability." *Mayo*, 132 S. Ct. at 1303 (quoting *Bilski*, 130 S. Ct. at 3225-27). But satisfaction of this standard is not a *sufficient* basis to show patentability, as the Supreme Court has "neither said nor implied that the test trumps" the general bar on patenting abstract ideas. *Id.*

Accordingly, buySAFE is simply wrong in asserting (Br. 18) that "whether one can perform the abstract idea without infringing the claims" is determinative of patentability. In *Parker v. Flook*, 437 U.S. 584, 589-90 (1978), the Supreme Court found a claim ineligible for patent protection even though it did *not* "wholly preempt" an unpatentable concept (a mathematical formula).

---

[3] Although buySAFE is correct to note that the Section 101 analysis is "separate and apart" from other requirements of the Patent Act, such as novelty and nonobviousness (buySAFE Br. 14), the Supreme Court has confirmed that the Section 101 inquiry will "sometimes overlap" with these other elements. *Mayo*, 132 S. Ct. at 1304. Holding otherwise would render the "exception[s] to § 101 patentability a dead letter." *Id.* at 1303.

The correct approach for considering whether a claim "too broadly preempt[s]" an unpatentable concept, the Supreme Court has instructed, is that a court *must* disregard any asserted limitations (1) that restrict an abstract idea to a "particular technological environment" or "field of use," (2) that are "well-understood," "routine," or "conventional," and (3) that are a "token-post solution addition." *See Mayo*, 132 S. Ct. at 1294; *Bilski,* 130 S. Ct. at 3231.

The district court correctly applied these guideposts in concluding that the relevant claims of the '019 Patent are not patentable. *First*, buySAFE concedes that its claims turn on an abstract idea. *Second*, buySAFE's hodgepodge of purported limitations cannot salvage its claims. *Third*, the claims fail the machine-or-transformation test, confirming that they are not patent eligible. *Fourth*, the Court's recent *CLS* decision further demonstrates that the district court reached the correct result.

## A. buySAFE concedes that the claims turn on an abstract idea.

The relevant claims here embody an abstract idea—"the concept of guaranteeing the performance of a transaction after that transaction is closed." A10. The claims themselves describe a method to provide "a transaction performance guaranty." A45, Claim 1. This is the classic con-

cept of a third-party suretyship, an abstract idea that has existed for mil-
lennia. *See supra*, at 2-5.

buySAFE does not dispute this point; it recognizes that "the general-
ized idea of a transaction performance guaranty" is an "example" of an
"abstract idea." buySAFE Br. 11; *see also id*. at 16 (a "transaction perfor-
mance guaranty" is an "abstract concept"); *id*. at 20 ("the idea of the trans-
action performance guaranty").

During claim construction, moreover, buySAFE advocated for the
broadest possible interpretation of its claims. In declining to read the
claim terms in light of the specification, buySAFE argued that it was nec-
essary to "capture[] the broad scope" of the concept. Dkt. No. 39, at 9. In
buySAFE's view, the broad concept claimed by the patent includes, among
others, "a surety bond," "a specialized bank guaranty," "a specialized in-
surance policy," or—self-referentially—"a safe transaction guaranty." *Id*.
at 8. buySAFE criticized Google for advancing what it viewed as a "flawed,
narrow construction." Dkt. No. 44, at 4. *Cf. Organic Seed Growers & Trade
Ass'n v. Monsanto Co.*, 718 F.3d 1350, 1358 (Fed. Cir. 2013) ("It is well-
established that a party who successfully argues one position is estopped
from later adopting a contrary position in a case involving the same pat-
ent.").

Accordingly, as buySAFE correctly recognizes, "the Court must de-
cide whether the claims at issue 'do *significantly more* than simply de-
scribe' an abstract concept." buySAFE Br. 16 (emphasis added). The claims
manifestly fail that standard.

### B. buySAFE's asserted limitations do not salvage the claims.

buySAFE asserts that it can patent the abstract idea of suretyship
because its claims contain three purported limitations: the "Internet,"
"computer," and "temporal" limitations. These limitations, viewed in isola-
tion as well as in combination, however, "add nothing of significance" to
the abstract idea. *Mayo*, 132 S. Ct. at 1302. They surely do nothing "other
than what is well-understood, routine, conventional activity, [and] previ-
ously engaged in by those in the field." *Id*. at 1299. Just as this Court has
routinely rejected arguments that similar asserted limitations save a
claim from ineligibility under Section 101 (*see, e.g., CyberSource Corp. v.
Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011)), the district
court was correct to conclude that the limitations buySAFE asserts here do
nothing to salvage the patent eligibility of the claims at issue.

buySAFE complains that, in conducting its analysis, the district
court "stripped away the Claim limitations to an abstract idea, and only
after that found that the Claims described non-patentable subject matter."

buySAFE Br. 15. But the district court did exactly what the Supreme Court requires; after identifying the abstract idea, the court considered "[w]hat else is there in the claims." *Mayo*, 132 S. Ct. at 1297. The court reviewed buySAFE's asserted limitations, but determined, correctly, that they are "not sufficient to transform an unpatentable idea into a patent eligible application of the idea." A10.

Now, citing the pronouncement in *Diehr*, 450 U.S. at 188 (1981), that "claims must be considered as a whole" (buySAFE Br. 14-15), buySAFE takes a scattershot approach, peppering its brief with sporadic reference to its purported limitations, without analyzing them individually. Although the Court should consider the "combination" of the asserted steps, the Court first must "separately" analyze each purported limitation to determine what significance, if any, it has for the Section 101 analysis. *Mayo*, 132 S. Ct. at 1298.

### 1. The "Internet" limitation.

buySAFE first points to a purported Internet limitation, asserting that its claims require "an online commercial transaction over a computer network." buySAFE Br. 17; *see also id*. at 11 ("an online commercial transaction"); *id*. at 18 ("online commercial transaction limitation"); *id*. at 22 ("claim a functional application in an E-commerce environment"); *id*. at 31

(the "underwriting limitation in the Claims refers to underwriting a specific online transaction, via a computer and over a computer network").

buySAFE's argument, accordingly, is that if an abstract idea is applied via the Internet, it becomes eligible for patent protection. This argument is wrong for multiple reasons, and it would lead to absurd results.

To begin with, all this limitation does is confine an abstract idea "to a particular technological environment" or to "one field of use." *Bilski*, 130 S. Ct. at 3230-31 (quotation omitted). But such efforts cannot "circumvent[]" the "prohibition against patenting abstract ideas." *Id.* at 3230. "To hold otherwise would allow a competent draftsman to evade the recognized limitations on the type of subject matter eligible for patent protection." *Diehr*, 450 U.S. at 192.

The problem with this kind of limitation is that it merely *subtracts* from the unpatentable idea by illustrating particular examples of where it may be used; it "adds nothing" to the abstract concept (*Mayo*, 132 S. Ct. at 1298), and thus contains no "inventive concept" (*id.* at 1294). Virtually *any* abstract idea could be limited to online applications, but that restriction does not qualify as a meaningful limitation for purposes of Section 101.

*Bilski* illustrates this principle at work. There, the patent first claimed the abstract idea of "hedging risk," and then limited that idea to

"application" in the context of "energy markets." *Bilski*, 130 S. Ct at 3229. That limitation to "one field of use" did not save the claim, as it merely provided "broad examples of how hedging can be used in commodities and energy markets." *Id*. at 3231. Limiting an abstract idea to a sub-field of possible applications thus does not render it patentable.

That is not all. Given the ubiquity of the Internet, simply directing that an abstract idea should be implemented online is "well-understood," "routine," and "conventional." *Mayo*, 132 S. Ct. at 1294. Such a "conventional step[] specified at a high level of generality" "cannot make * * * ideas patentable." *Id*. at 1300. Nothing about an Internet limitation, standing alone, adds anything nonconventional to an abstract idea.

Accepting buySAFE's position—that implementing via the Internet an abstract idea, law of nature, or physical phenomenon renders it patentable—would produce absurd results. For example, "Einstein could not patent his celebrated law that E=mc$^2$." *Mayo*, 132 S. Ct. at 1293. Nor could he "have patented his famous law by claiming a process consisting of simply telling linear accelerator operators to refer to the law to determine how much energy an amount of mass has produced." *Id*. at 1297. Nor can that formula be patented simply by directing one to make the relevant calculations via the Internet.

For these reasons, an abstract idea cannot become patentable by limiting it to applications involving the Internet. If the rule were otherwise, one could patent the mere concept of sending communications via the Internet, the concept of providing news via the Internet, and virtually *every* kind of broad activity that takes place online.

### 2. The "computer" limitation.

buySAFE's second purported limitation—the requirement of "a computer application running on the computer of a safe transaction service provider" (buySAFE Br. 17)—also does nothing to render its claims patent eligible. This limitation is largely duplicative of, and thus fails for similar reasons as, the "Internet" limitation. At bottom, one cannot make an abstract idea patent eligible by claiming simply to "apply it" via a computer. *Cf. Mayo*, 132 S. Ct. at 1294 ("[T]o transform an unpatentable law of nature into a patent-eligible *application* of such a law, one must do more than simply state the law of nature while adding the words 'apply it.'").

This Court has repeatedly held that one cannot "attempt[] to limit the abstract idea * * * by applying it in a computer environment." *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013). A computer may "salvage an otherwise patent-ineligible process" only where it is "integral to the claimed invention, facilitating the

process in a way that a person making calculations or computations could not." *Bancorp Servs., L.L.C. v. Sun Life Assurance Co.*, 687 F.3d 1266, 1278 (Fed. Cir. 2012), *petition for cert. filed,* No. 13-584. Where a computer "is employed only" for a "basic function" that "performs more efficiently what could otherwise be accomplished manually," the claim is not patentable. *Id*. at 1278-79. Abstract ideas that could, but for the computer limitation, be accomplished "by a human using a pen and paper" are not patent eligible. *CyberSource*, 654 F.3d at 1372.

The Court has regularly rejected patent claims that merely implement an abstract idea via a computer. *See*, *e.g.*, *Accenture*, 728 F.3d at 1344 (finding unpatentable a claim that "implements the general idea of generating tasks for insurance claim processing" via a computer); *Bancorp*, 687 F.3d at 1279 (a claim that "employ[s] computers to track, reconcile, and administer a life insurance policy with a stable value component"); *Fort Props., Inc. v. Am. Master Lease LLC*, 671 F.3d 1317, 1323-24 (Fed. Cir. 2012) (method of creating real investments via a computer); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333-34 (Fed. Cir. 2012) (computer implementation of clearing house for processing credit applications in automotive industry); *CyberSource*, 654 F.3d 1366 (computer implementation of method for detecting credit card fraud over the Internet).

Each of these cases held that merely implementing via a computer an abstract idea that exists outside the digital environment does not render that idea eligible for patent protection. The claims in this case are no different, as one can readily implement the abstract idea of a transaction performance guaranty without a computer. The district court was correct to conclude that the computer limitation at issue here cannot render the claims patentable because "[m]erely using a computer to perform more efficiently what could otherwise be accomplished manually does not confer patent-eligibility." A9.

### a. The "computer" limitation is not integral to the asserted claims.

buySAFE's asserted computer limitation is far from "integral" to the claims asserted in this case. *Bancorp*, 687 F.3d at 1278. The use of a computer does not perform a function that, but for the computer limitation, a human could not accomplish. *Id*. Instead, as the district court found, "the patent's process would be performed exactly the same way by a person and by a computer, the only difference being that the computer performs the process significantly faster than a human." A9. The insignificance of the computer limitation is apparent in several ways.

*First*, third parties have guaranteed commercial transactions for thousands of years—doing so without any computer implementation. *See*

*supra*, at 2-5. Thus, absent the computer limitation, this is a process that can—and is—"performed in the human mind, or by a human using a pen and paper." *CyberSource*, 654 F.3d at 1372. Using a computer to speed the process cannot render it patentable. *Bancorp*, 687 F.3d at 1278.

*Second*, buySAFE *acknowledged* before the district court that "[i]f the transaction was not online," "all the steps contemplated here could be conducted without a computer." A119. buySAFE's counsel candidly admitted that "you can, in the middle of buying a pair of shoes, go off and make a phone call and then try to work out a guaranty and come back a week later." A106. And further, at the hearing, buySAFE *conceded* that "there is no question that the patent was drafted to embrace non-computer applications." A112. The district court properly pointed to these admissions as further support for finding the claims unpatentable. A8.

*Third*, the '019 specification itself explains that the step that buySAFE believes to be so critical—the underwriting portion of the transaction performance guaranty (*see* buySAFE Br. 18)—may be performed *without a computer*.[4] The specification reveals that "[t]he underwriter may

---

[4] In assessing whether a claim is drawn to patent-eligible subject matter, it is appropriate to look to the specification, which provides significant context for the claimed innovation. *See*, *e.g.*, *Bancorp*, 687 F.3d at 1280;

be *a person*, a corporation *that carries out the underwriting process* either *manually* or automatically through a computer application program or semi-automatically." A39 (col. 6:57-60) (emphasis added); *see also* A8.

When discussing the machine-or-transformation test, buySAFE tries to explain away this part of the specification. *See* buySAFE Br. 30-31 (citing A39 (col. 6:43-65)). It argues that the "underwriting" process in this portion of the specification is somehow different than the "underwriting" process at issue in the asserted claims. *Id*. at 31. That is wrong. This provision of the specification applies to "underwriting" as used throughout the claims. Indeed, buySAFE pointed to *precisely* this material in its claim construction brief, arguing that it is the "relevant excerpt" of the specification regarding the claims asserted in this case. Dkt. No. 39, at 12. It even quoted in that brief the portion of the specification disclosing that underwriting may be done manually. *Id.*

*Fourth*, the prosecution history also demonstrates that the computer limitation is nothing more than an afterthought. The initial patent application contained no computer limitations whatsoever. *See, e.g.*, A230,

---

*CyberSource*, 654 F.3d at 1372. Indeed, when it suits it, buySAFE also points to the specification. *See, e.g.*, buySAFE Br. 26.

A241.[5] Only in subsequent amendments did buySAFE claim computer limitations; buySAFE added the limitation *six years* after filing its initial application. *See* A617, A624, A670. (*Bilski* and its progeny subsequently made clear that this limitation could not resolve the Section 101 defect of this claim.)

The late inclusion of the computer limitation is evidence that it was nothing more than an afterthought to what buySAFE sought to claim. In *Fort Properties*, 671 F.3d at 1322-23, the patent first claimed an abstract idea without any computer implementation. Next, the patent took those same claims and added computer limitations. *Id.* at 1323. After finding the initial claims unpatentable as abstract ideas, the Court concluded that "simply add[ing] a computer limitation to claims covering an abstract concept" is "insignificant post-solution" activity that "cannot qualify as patent-eligible." *Id.* at 1323-24. The same is true here.

---

[5]   The Court may consider the prosecution history of the patent. buySAFE relies on it here (buySAFE Br. 8-9, 19), and acknowledged below that "the prosecution history" "is a matter of public record." A113; *cf. Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 514 (Fed. Cir. 1990) (taking judicial notice of reexamination record).

### b. The asserted claims do not disclose "specific" computer "components" or "algorithms."

buySAFE attempts to save its asserted claims by continuously repeating that they "require[] a specific combination of computer components." buySAFE Br. 18. buySAFE argues that there are "specific communications, routings and algorithms for performing" the steps asserted in its claims. *Id.* at 26. This refrain is repeated *ad nauseam* throughout the entirety of buySAFE's brief. *See, e.g., id.* at 3 ("specific machine"); *id.* at 4 ("specific computer-application based methods and media"); *id.* at 12 ("a computer programmed to perform specific algorithms"); *id.* at 30 ("a specific computer to perform particular steps"); *id.* at 32 ("specific computer code that creates a specific machine"); *id.* ("concrete, specific code"); *id.* ("a specific computer programmed using specific algorithms").

The problem for buySAFE, however, is that these assertions are just not true. The claims in this case require nothing more than "one computer application program running on a computer." *See, e.g.*, A45 (claim 1). All the computer does is perform "processing," "a basic function of any general purpose computer." A9. Any off-the-shelf personal computer will do. buySAFE's argument that its claims require some kind of "specific" computer "components" or "algorithms" unravels upon examination of the bits and pieces of the '019 Patent that it cites.

31

Although buySAFE does not quote the parts of the '019 Patent it believes relevant to this analysis, it provides general citations in its brief:

- Br. 18: cites col. 11:4-16 (A42); col. 15:16-30 (A44);

- Br. 26: cites Fig. 8 (A22); col. 8:65 to col. 9:46 (A40-A41);

- Br. 31: cites Fig. 13 (A29); col. 14:63-67 (A43); col. 15:16-30 (A44);

- Br. 32: cites col. 15:1-30 (A44).[6]

Notably, not one of these citations is to an asserted *claim*; instead they refer to portions of the specification. Nonetheless, these snippets of the '019 Patent—which, for ease of reference, we refer to as (a) the "pre-screening" and "authentication key" specification and, (b) the "mechanism" specification—fail to support buySAFE's repeated assertion that there is some kind of "specific" "component" or "algorithm" at issue here.

**The "pre-screening" and "authentication key" specification**. The bulk of the patent specification to which buySAFE points relates to two concepts: a process of "pre-screening" and an "authentication key." *See* Fig. 13 (A29); col. 11:4-16 (A42); col. 14:63-67 (A43); col. 15:1-30 (A44). buySAFE does not quote from this material; it merely asserts that it dis-

---

[6] buySAFE (Br. 31) also points to column 6, lines 43-65 (A39), but only to rebut our use of the specification's admission that the underwriting process may happen manually. *See supra*, at 29. buySAFE does not assert that there is any "specific" "component" or "algorithm" disclosed there.

closes "verifications and protocols provided in a network environment" that are used for "the identification of and communication between the parties" or the "underwriting limitation." buySAFE Br. 18, 31-32. There are two fundamental problems.

*First*, this material is entirely irrelevant to the asserted claims. Figure 13 (A29) and column 14, lines 65 to 67 (A43), relate to a purported method for "pre-screening." And column 11, lines 4 through 16 (A42), as well as column 15, lines 1 through 30 (A44), relate to the use of an "authentication key" to be given to a "subscriber" at the time of a "particular transaction." *See* buySAFE Br. 18, 31-32.

These issues—"pre-screening" and an "authentication key"—have nothing to do with the claims that buySAFE asserts in this litigation, *i.e.*, claims 1, 14, 39, and 44. To be sure, *other* claims do incorporate these elements. Dependent claims 15, 16, and 45 discuss "pre-screening." A45-A47. And dependent claims 18, 22, and 48 use an "authentication key." *Id*. But buySAFE did not assert *those* claims. In "considering patent eligibility under § 101, one must focus on the claims." *Dealertrack*, 674 F.3d at 1334. Given that what is "disclosed but left unclaimed" has no bearing on the Section 101 analysis (*id*.), non-asserted claims are certainly irrelevant.

*Second*, setting aside the complete irrelevance of "pre-screening" or an "authentication key" to the claims in this case, buySAFE mischaracterizes this material. Those snippets of the specification do not disclose any kind of "specific computer" or "specific code." In fact, *nothing* in this portion of the specification cited by buySAFE describes the use of *any* computer at all. (At A44, column 15, line 14, the word "computed" appears, but "computed" is a synonym for "calculated.") To the extent that a computer may be used to perform these tasks, it is simply performing generic database processing. There is no "specific" computer or code disclosed.

**The "mechanism" specification**. buySAFE also points to Figure 8 (A22) as well as column 8, line 65 through column 9, line 46 (A40-A41). buySAFE Br. 26. buySAFE describes this material as showing "specific communications, routings and algorithms for performing these steps." *Id*.

Again, that is not accurate. Nothing in this material describes the use of a computer whatsoever, much less any kind of "specific" computer. Nor does this material describe any kind of algorithm.

What this material does do is explain that a "safe transaction service provider" would use different "mechanism[s]" to perform the asserted steps. A41 (col. 9:1-22). Contrary to buySAFE's contention (Br. 26), the

34

specification does not require the use of any "particular machine." The word "mechanism" could not be any more vague or unspecific.

In fact, the specification discloses that a "mechanism" need not be a computer at all. A different part of the specification explains that "[t]he dispute resolution *mechanism* may be *manually* operated, automatically operated, or semi-automatically operated." A43 (col.13:37-39) (emphasis added). The "mechanism" portion of the specification, accordingly, discloses no computer implementation whatsoever.

### c. Dealertrack *and* CyberSource *foreclose buySAFE's argument.*

What buySAFE really asserts is that the mere fact of computer implementation, coupled with the Internet limitation, means a computer *must* be used to perform the process as claimed. buySAFE Br. 18 ("These limitations as claimed, in fact, *cannot* be performed absent a computer."). buySAFE contends that this is *enough* to "transform the nature of the Claims from an abstract idea to a specific application of the idea." *Id.*

But this Court has repeatedly rejected the argument that merely implementing an abstract idea via a computer—even if it is limited to a computer network that *requires* computer technology—is a sufficient limitation to make that abstract idea patentable.

*Dealertrack* is indistinguishable from this case. There, the claims related to a computer-based method for processing, via computer networks, credit applications for auto loans. 674 F.3d at 1319-20. Reviewing claim construction, the Court specifically held that the claims included use of the Internet. *Id.* at 1323. Notwithstanding the computer and Internet limitations, the claims did "not specify how the computer hardware and database are specially programmed to perform the steps claimed in the patent." *Id.* at 1333 (quotation omitted). Nor were the claims "limited to any particular algorithm." *Id.* at 1334. The claims were thus held unpatentable under Section 101. This case is no different.

Likewise, in *CyberSource*, the patent claimed a method for detecting fraudulent Internet transactions by comparing certain Internet-obtained information (such as IP and MAC addresses) with known information. 654 F.3d at 1367. Because comparing transaction data against known prior data in order to detect fraud is an abstract idea, the patentee argued—almost identically to buySAFE's claim here—that the Internet limitation rendered the claim patentable, as "it 'would not be necessary or possible without the Internet'" to complete the claimed process. *Id.* at 1370. This Court disagreed, finding that the processing elements could "be performed in the human mind, or by a human using a pen and paper." *Id.* at 1372.

The patentee next pointed to a claim that implemented this process via a computer program, but this Court explained "[t]hat purely mental processes can be unpatentable, even when performed by a computer." *Cybersource*, 654 F.3d at 1375 (citing *Gottschalk v. Benson*, 409 U.S. 63 (1972)). The fact that the claim could be "performed without the use of a computer" was strongly indicative that it was not patent eligible. *Id.*

Finally, the Court recently rejected even *hardware* claims in *Accenture*. Despite the *required* use of a computer, the Court nonetheless found that a database processing limitation did not "limit the abstract concept in a meaningful way." *Accenture*, 728 F.3d at 1345. Thus, even where a specification provides "very detailed software implementation guidelines," this is still not enough to "transform a claim reciting only an abstract concept into a patent-eligible system or method." *Id.*

In sum, limiting a concept that humans can and do perform in analog form to computer implementation over a network—which *necessarily* requires a computer—is not sufficient to render it patent-eligible subject matter. By contrast, the cases relied upon by buySAFE underscore why the claims here are *not* eligible for patent protection.

buySAFE points (Br. 22) to *Research Corp. Technologies, Inc. v. Microsoft Corp.*, 627 F.3d 859, 862-64 (Fed. Cir. 2010), which considered

claims relating to halftoning—a means for computer displays and printers to simulate additional colors than those otherwise available. But the Court concluded that there was "nothing abstract in the subject matter" of that process. *Id.* at 868. (Here, of course, buySAFE *admits* that a "transaction performance guaranty" is an "abstract idea.") Rather, the process of halftoning—which *does not exist outside the computer context*—is entirely tied to a technological environment. *See CyberSource*, 654 F.3d at 1376 (*Research Corp.* involved a method that "could not, as a practical matter, be performed entirely in a human's mind"). The process "was dependent upon the computer components required to perform it." *Bancorp*, 687 F.3d at 1279.

Likewise, in *SiRF Technology, Inc. v. International Trade Commission*, 601 F.3d 1319, 1323 (Fed. Cir. 2010), the Court considered the patent eligibility of an advanced GPS system that correlated satellite signals received by the device with data received from locally generated codes. The patented process included use of computing to determine the position of the GPS receiver. *Id.* at 1331. In finding the claims eligible for patent protection, the Court explained that "[i]t is clear that the methods at issue could not be performed without the use of a GPS receiver." *Id.* at 1332. Thus "there [was] no evidence * * * that the calculations * * * can be per-

formed entirely in the human mind." *Id*. at 1333. There was nothing abstract, as a computer "facilitat[ed] the process in a way that a person making calculations or computations could not." *Bancorp*, 687 F.3d at 1278.

Finally, the claims in *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335 (Fed. Cir. 2013), *petition for cert. pending*, No. 13-255, are also distinct. Beyond applying the abstract idea of considering advertising as currency, those claims "involve[d] an extensive computer interface." *Id*. at 1352. There were "eleven separate and specific steps with many limitations and sub-steps in each category." *Id*. at 1352-53. And there was an extensive algorithm explaining how a computer would be programmed to perform those steps. *Id*. "[C]ommon sense alone establishe[d] that these steps are not inherent in the idea of monetizing advertising" as there "are myriad ways to accomplish that abstract concept that do not infringe these claims." *Id*. at 1353. These claims thus contained "additional limitations from the abstract idea of advertising as currency." *Accenture*, 728 F.3d at 1345.

*Ultramercial* noted that the claims did not simply "say 'sell advertising using a computer.'" 722 F.3d at 1352. Here, however, the claims *do* effectively say "use transaction performance guaranties for online commerce." That is what renders the claims unpatentable.

In sum, all that the computer limitation does here—as in *Accenture*, *Bancorp*, *Fort Properties*, *Dealertrack*, and *CyberSource*—is permit an abstract idea to run more efficiently via a computer network. That is not sufficient to make an abstract idea eligible for patent protection. Quite unlike *Research Corp.*, *SiRF*, and *Ultramercial*, the underlying idea is neither tied to the use of computer technology nor accompanied by specific means of computer implementation. The computer limitation, accordingly, has no bearing on the patentability of these claims.

### 3. The "temporal" limitation.

buySAFE also asserts that a "temporal" limitation—"the binding of the transaction performance guaranty services * * * after the online commercial transaction closes"—somehow renders its claims eligible for patent protection. buySAFE Br. 17; *see also id*. at 19-20. The "temporal" limitation, however, does not "add" *anything* to the abstract idea, and it surely does not "add *enough*." *Mayo*, 132 S. Ct. at 1297. The district court was correct to reject this argument. A10.

*First*, the so-called "temporal limitation" is not a limitation at all. A guaranty, by definition, *must* be bound to the underlying transaction. And there are only three possible options of when that binding may occur: it may bind before, during, or after the closing of the underlying transaction.

*Each* of these embodiments is part of the abstract idea itself. Identifying that binding is a necessary component of a performance guaranty thus does not cure the Section 101 defect. Nor does it cure the defect by choosing one of three embodiments of the abstract idea. All that does is to say, "the claim is directed to the *concept* of guaranteeing the performance of a transaction *after* that transaction is closed." A10 (emphasis added).

This same problem was at the heart of the Supreme Court's rejection of the patent claims in *Mayo*. There, in addition to reciting the natural law, the claims included steps for "administering" and "determining" the use of a drug. 132 S. Ct. at 1297-98. But "[a]nyone who wants to make use of these laws must first administer a thiopurine drug and measure resulting metabolite concentrations." *Id.* at 1298. Thus, the "combination" asserted in the patent claims "amounts to nothing significantly more than an instruction to doctors to apply the applicable laws when treating their patients." *Id.* Disclosing steps that are necessary to the use of the abstract idea cannot render a claim patentable.

The concurring opinion by Chief Judge Rader and Judge Moore in *CLS Bank International v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1312 (Fed. Cir. 2013), also identifies this issue. An asserted step that "is nothing but a recitation of a step inherent in the [abstract] concept" cannot confer pat-

entability, because a step that is an "inherent feature" of the abstract idea "adds nothing beyond the well-known procedures used in the concept." *Id*.

Examples further illustrate this point. In a transaction for the sale of goods, a surety can guarantee the performance of *either* the buyer *or* the seller. (Here, buySAFE claims its patent covers both.) That is necessarily part of the abstract idea. Limiting the application of suretyship to guaranteeing the seller alone would have no bearing on the Section 101 analysis, as the claim would still be nothing more than the abstract idea.

Additionally, one may wish to hedge a commodity in light of a belief that its price will either increase or decrease in the future. Hedging against future price changes thus has two general embodiments, going "long" or going "short;" one cannot patent the abstract concept of risk hedging by limiting it to hedging against future price *increases*.

The requirement that a limitation must "add" something to an abstract idea means that claiming one embodiment of the idea will not, standing alone, suffice to render it patentable. *Mayo*, 132 S. Ct. at 1297 (querying whether "the patent claims add *enough* to their statements of the correlations to allow the processes they describe to qualify as patent-eligible processes that *apply* natural laws").

Under buySAFE's view, it could have filed three separate patent applications—one in which the surety is bound *before* the underlying transaction is created, one in which the surety is bound *during* the underlying transaction, and one in which the surety is bound *after* the underlying transaction—and all three would satisfy Section 101. That is not the law.

*Second*, even if this were a limitation, it is surely "well-understood" and "routine." *Mayo*, 132 S. Ct. at 1294. Post-closing suretyships have been well known for centuries. *See supra*, at 2-4. Thus, there is hardly anything nonconventional about this application of the surety concept.

At most, this is "a token postsolution component." *Bilski*, 130 S. Ct. at 3231. The original patent application had no "temporal" limitation. *Compare* A230, A241 *with* A617, A624, A670. Nor does anything in the specification suggest that the temporal limitation is in any way integral to its claims. This kind of token component, accordingly, cannot provide a basis to patent an abstract idea.

In asserting that the temporal limitation has some relevance, buySAFE points to *Bilski*. buySAFE Br. 19. It argues that its claims are patentable because they would not preempt "*all* transaction performance guaranties" since "binding at any time before the transaction closes" "would not meet this limitation." *Id*. (emphasis added). buySAFE charac-

terizes *Bilski* as "finding ineligible a patent on risk hedging because the claims would preempt use in *all* fields." *Id.* (emphasis added).

This argument severely misreads *Bilski*, as the test is *not* whether the patent claim would preempt use of an abstract idea in *all* fields. *Bilski* held the opposite; the Court found that a field-of-use limitation, which would permit use of the idea in all *other* fields, could not circumvent the prohibition on patenting an abstract idea. *Bilski*, 130 S. Ct. at 3231.

Decades before *Bilski*, moreover, the Supreme Court held that even if a claim does not "wholly preempt" a patent-ineligible concept (there, a mathematical formula), it still may be outside the scope of Section 101. *Flook*, 437 U.S. at 589. The question here, accordingly, is not whether it is possible to practice the concept of a transaction performance guarantee without infringing buySAFE's patent; the question is whether the "temporal" limitation is a limitation at all, and, if it is, whether the limitation is merely conventional or a token post-solution addition.

Finally, buySAFE attempts to tie its asserted temporal limitation to *Diehr*, 450 U.S. at 191, where the Supreme Court found a process involving a mathematical equation patentable. *See* buySAFE Br. 20-21. There, although a patent claim used an equation, it created several "additional steps" that "integrated the equation" into a process for making rubber.

*Mayo*, 132 S. Ct. at 1298. Those steps included "installing rubber in a press, closing the mold, constantly determining the temperature of the mold, constantly recalculating the appropriate cure time through the use of the formula and a digital computer, and automatically opening the press at the proper time." *Diehr*, 450 U.S. at 187.

As the Supreme Court later explained, nothing suggested that those steps in *Diehr* were "[p]urely 'conventional.'" *Mayo*, 132 S. Ct. at 1298. Moreover, those steps were not necessary to apply the mathematical equation. Because the so-called "temporal" limitation fails on both counts, this case is not at all like *Diehr*.

### 4. The combination of asserted steps.

Although buySAFE makes much of the need to view the claims as a whole (buySAFE Br. 14-15), it does not attempt to show how its asserted steps or limitations combine to create something sufficiently inventive to render it patent eligible. *See Mayo*, 132 S. Ct. at 1298. Here, the relevant claims assert only three steps: (1) a computer operated by a surety **receives** a request to guarantee an underlying transaction; (2) the computer **processes** the transaction to determine whether to offer the guaranty (*i.e.*, "underwriting"); and (3) the computer **binds** the guaranty to the transaction after it closes. *See* A45.

But, just as in *Mayo*, "[a]nyone who wants to make use of [this abstract idea]" *must* perform these steps. 132 S. Ct. at 1298. A surety can provide a transaction performance guaranty *only* if it (1) receives a request to do so, (2) decides to offer the guaranty, and (3) binds that guaranty. Reciting these "three steps as an ordered combination adds nothing to the [abstract idea] that is not already present when the steps are considered separately." *Id.*

## C. The machine-or-transformation test confirms that the claims are unpatentable.

As the district court correctly concluded, the claims all "fail the machine-or-transformation test" (A11), which is "a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under § 101." *Bilski*, 130 S. Ct. at 3227. buySAFE does not contend that its claims qualify as a "transformation," and they surely do not qualify as a "machine."

1. buySAFE's argument with respect to the machine-or-transformation test is, once again, premised on a gross mischaracterization of the content of the claims it has asserted in this case.

buySAFE repeats its argument that the claims require "a computer programmed to perform specific algorithms." buySAFE Br. 12. And that they "require a specific computer to perform particular steps" that "create

46

a special-purpose computer." *Id.* at 30. And further that they "require[]
concrete, specific code creating a specialized machine that transmits this
information to the third-party provider." *Id.* at 32.

As we have explained (*supra*, at 31-35), this is just not true. The
claims asserted here do not disclose any algorithm. Nor do they disclose
any "concrete, specific code." Nor do they require the use of any "specific"
computer component. All that the claims asserted require is a "general
purpose computer" capable of basic processing functions (A9)—*i.e.,* any off-
the-shelf personal computer.

buySAFE contends that implementing its claimed process on a com-
puter would "require[] concrete, specific code." buySAFE Br. 32. But
buySAFE's asserted claims do not reveal what this "concrete, specific code"
might be. The mere prospect that one who seeks to perform the asserted
claims would have to write actual computer code has no bearing whatso-
ever on whether these claims, as drafted, satisfy the machine-or-
transformation test. Under buySAFE's contrary view, every computerized
process would satisfy the "machine" test because it would require comput-
er code in order to be implemented. Accepting that contention would drain
all substance from the "machine" test.

2. buySAFE's fallback argument is that, because its claims are limited to computer implementation involving online commerce, this alone is enough to satisfy the machine-or-transformation test. *See* buySAFE Br. 31 (contending that it is necessary to use a computer to "execut[e] the online commercial transaction"). This argument—which is no different than the argument buySAFE presses with respect to its asserted computer and Internet limitations—is flatly wrong. In particular, buySAFE's machine-or-transformation argument is foreclosed by *Dealertrack* and *CyberSource*.

In *Dealertrack*, like here, the claims limited the application of the abstract idea to computers operating via computer networks. 674 F.3d at 1318. And the patentee made the same machine-or-transformation argument that buySAFE makes here—that "the steps set forth in the claims constitute the programming of the general purpose computer, making it a special purpose computer sufficient to meet the machine prong." *Id.* at 1332. But the Court unambiguously rejected this contention because, despite the patentee's assertions, "[t]he claims here do not require a *specific* application, nor are they tied to a *particular* machine." *Id.* at 1333-34 (emphasis added). Rather, "the claims cover a clearinghouse process using any existing or future-devised machinery." *Id.* at 1334. And the claims are not

"limited to any particular algorithm." *Id*. The claims, accordingly, did not satisfy the machine-or-transformation test. *Id*.

There is no meaningful distinction between this case and *Dealertrack*. The claims here can operate on any computer, and they are not tied to any particular machine or particular algorithm.

Likewise, *CyberSource* involved a "computer readable medium" claim that also *required* execution on computers. 654 F.3d at 1369. But the Court held that "the basic character of a process claim drawn to an abstract idea is not changed by claiming only its performance by computers, or by claiming the process embodied in program instructions on a computer readable medium." *Id*. at 1375. This "does not satisfy the machine prong of the machine-or-transformation test." *Id*.

These cases together demonstrate that limiting tasks that can be accomplished as a "purely mental process" to computer implementation cannot, by itself, satisfy the machine prong of the machine-or-transformation test. *CyberSource*, 654 F.3d at 1375. buySAFE's core argument (Br. 31) conflicts with this basic, established principle.

*In re Alappat*, 33 F.3d 1526 (Fed. Cir. 1994), relied upon by buySAFE (Br. 30), highlights why the asserted claims fail. There, the claim was "a combination of interrelated elements which combine to form

a machine for converting discrete waveform data samples into anti-aliased pixel illumination intensity data to be displayed on a display means." *Id.* at 1544. There was no abstract concept that could exist outside the context of a computer. Rather, the claim was an innovation relating to *how* a particular computer performed; it was thus "a specific machine to produce a useful, concrete, and tangible result." *Id.*

The Court has "never suggested that simply reciting the use of a computer to execute an algorithm that can be performed entirely in the human mind falls within the *Alappat* rule." *CyberSource*, 654 F.3d at 1375. Nothing about the claims asserted here transforms the use of a general purpose computer into some sort of specialized machine that would satisfy the machine-or-transformation test.

## D. The claims are also patent ineligible under *CLS*.

The approaches identified by the Court in *CLS* further demonstrate why these claims are not eligible for patent protection. Although buySAFE attempts to shoehorn its claims into the *CLS* framework (Br. 22-28), the majority of the Court *rejected* as patent ineligible claims that—as buySAFE itself argued below—are analogous to those here. As the district court concluded, although the claims at issue in this case would be "patent-ineligible" "even under the reasoning of the *CLS* panel decision," the

Court's *en banc* decision makes Google's "argument for patent-ineligibility * * * even stronger." A11.

The method claims in *CLS* involved computer implementation of third-party credit intermediation. *See CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1274 (Fed. Cir. 2013) (Lourie, J., concurring). In the district court, buySAFE—relying heavily on the now-vacated panel decision in *CLS*—argued that these are "*the same type of claims*." Dkt. No. 40, at 1 (emphasis added); *see also id*. at 7 ("*CLS Bank* is also instructive here because it involved technology and claims similar to those of the '019 Patent.").

Given buySAFE's argument that its claims are analogous, the fact that seven members of the Court subsequently found the method claims in *CLS* ineligible for patent protection should foreclose buySAFE's appeal. *See CLS*, 717 F.3d at 1287 (Lourie, J., concurring). To be sure, the Court split five to five when it considered the *hardware* claims. Attempting to make lemonade from this lemon, buySAFE invokes analysis of *those* claims. buySAFE Br. 26. But the claims asserted in this case are not hardware claims at all.[7]

---

[7] Here, claims 1 and 14 are traditional method claims, like claim 33 of the '479 Patent in *CLS*. *See CLS*, 717 F.3d at 1285. And claims 39 and 44

**Opinion by Judge Lourie.** buySAFE first points to the decision by Judge Lourie (joined by Judges Dyk, Prost, Reyna, and Wallach). buySAFE Br. 22-24. But the framework of that decision renders the claims at issue here unpatentable. The opinion explained that "[i]n a claimed method comprising an abstract idea, generic computer automation of one or more steps evinces little human contribution." *CLS*, 717 F.3d at 1286. Further, "simply appending generic computer functionality to lend speed or efficiency to the performance of an otherwise abstract concept does not meaningfully limit claim scope for purposes of patent eligibility." *Id.* Thus, "[u]nless the claims require a computer to perform operations that are not merely accelerated calculations, a computer does not itself confer patent eligibility." *Id.*

Judge Lourie concluded that the patents in *CLS* failed that standard. The computer performed mere calculation and processing functions that could be done by a human, albeit much more slowly. *CLS*, 717 F.3d at 1286. As for the creation of a so-called "shadow credit record," this was

---

are "*Beauregard*" storage medium claims like claims 39, 40, and 41 of the '375 Patent in *CLS. See id.* at 1288. There are *no* claims in this case reciting computer hardware systems comparable to claim 1 of the '720 Patent or claim 26 of the '375 Patent in *CLS. See id.* at 1289, 1306.

Case: 13-1575 CASE PARTICIPANTS ONLY Document: 59 Page: 59 Filed: 12/09/2013

nothing more than an "insignificant pre-solution activity," which was thus disregarded. *Id.* at 1286-87 (quotation omitted).

In just the same way, the computer implementation here is irrelevant, as it takes a concept that can readily be performed by a human—a third-party guaranty—and simply uses a computer to implement it for online transactions. A9. The use of a computer is no more "essential" to the claims here (buySAFE Br. 24) than it was in *CLS*.

Additionally, Judge Lourie rejected an asserted temporal limitation—which required that instructions be sent at the end of the day—as "a similarly trivial limitation." *CLS*, 717 F.3d at 1287. Although the process could claim multiple ways in which instructions were exchanged (such as "in real time, every two hours, or at the end of every day"), there was no indication "that the precise moment chosen to execute those payments makes any significant difference in the ultimate application of the abstract idea." *Id.*

In the district court, buySAFE argued its claims and those in *CLS* "share[d]" "in common" a temporal limitation. Dkt. No. 40, at 9. Now that *CLS* rejected that asserted limitation, buySAFE has reversed course, arguing that the temporal limitation here is somehow a "critical distinction." buySAFE Br. 24. But there is no support for this assertion whatsoever. In-

stead, as we explained (*supra*, at 40-45), the time at which the guaranty binds is part and parcel of the abstract idea, so is no limit at all. And even if it were, it is nothing more than "conventional" and "token."

**Opinion by Chief Judge Rader, Judge Linn, Judge Moore, and Judge O'Malley.** buySAFE next points to the opinion of other members of the Court. buySAFE Br. 24-27. But that opinion provides no more support for its argument. Instead, it explains that, when considering whether computer implementation can render an abstract idea eligible for patent protection, "[t]he key to this inquiry is whether the claims tie the otherwise abstract idea to a *specific way* of doing something with a computer, or a *specific computer* for doing something." *CLS*, 717 F.3d at 1302 (Rader, C.J.; Linn, Moore, O'Malley, JJ., concurring). Claims that are "directed to *nothing more than the idea* of doing that thing on a computer" are likely not patent eligible. *Id.*

Chief Judge Rader and Judge Moore applied this test to the method claims at issue in *CLS*. They agreed with Judge Lourie that the method claims "are not eligible under Section 101." *CLS,* 717 F.3d at 1312-13. Given that buySAFE views those claims as the "same type" of claims at issue here, the result can be no different.

And the analysis employed by this opinion likewise forecloses buySAFE's argument. In considering whether the claims "in effect claim[] the abstract concept of an escrow," Judges Rader and Moore discounted certain claimed limitations. *CLS*, 717 F.3d at 1311-12. *First*, they disregarded steps that are "nothing but a recitation of a step inherent in the concept of an escrow." *Id.* at 1312. Adding steps that "recite[] merely a general step inherent within the concept of an escrow" cannot make an abstract idea patentable. *Id. Second*, they disregarded an asserted limitation to a "particular field." *Id.* Citing *Bilski* and *Flook*, they noted that asserted field limitations cannot render a claim eligible for patent protection. *Third*, an asserted "computer 'implementation'" limitation used in "some unspecified way" "is not, by itself, enough." *Id.*

Here, the "Internet" limitation is a mere field of use restriction. The "computer" limitation is entirely unspecific. And the "temporal" limitation is simply an "inherent feature" of a third-party suretyship. buySAFE's claims thus are unpatentable under this framework.

In considering this opinion, buySAFE inexplicably ignores the discussion of the *method* claims; it instead points to the *hardware system* claims. *See* buySAFE Br. 26. That opinion viewed the system claims as "traditional hardware claims;" for example, one of the patents "disclose[d]

at least thirty-two figures which provide detailed algorithms for the software with which this hardware is to be programmed." *CLS*, 717 F.3d at 1307. And there, the claim itself contained requirements for *specific* computer equipment. *Id*. at 1306-07.

buySAFE again repeats its assertion that the specification "describes specific communications, routings and algorithms for performing" the claimed steps. buySAFE Br. 26. But, as we have explained at length, this is false. Unlike the system claims in *CLS*, the actual *claims* asserted in this case do not disclose any piece of computer hardware. And while that is the end of the analysis (*see Dealertrack*, 674 F.3d at 1334), the parts of the patent specification cited by buySAFE do not disclose hardware either. *See supra*, at 31-35.[8]

Rather, as buySAFE acknowledged below, the claims it asserts are quite similar to the *method* claims in *CLS*, which seven members of the Court held unpatentable. The result can be no different here.

---

[8] For this reason, buySAFE's citation to Judge Moore's opinion is wholly misplaced. Judge Moore agreed with Chief Judge Rader that the method claims were unpatentable; she wrote specifically to address the hardware claims. *CLS*, 717 F.3d at 1314.

## II. No Judgment Has Been Entered With Respect To The Claim Construction Order.

This appeal does not raise any issues with respect to the appropriateness of the district court's *Markman* Ruling, as that decision is not yet ripe for appeal, for the reasons set forth below.[9]

As a preliminary matter, no judgment has been entered in connection with the district court's *Markman* Ruling from which either party could take an appeal. The judgment relates only to the district court's ruling on Google's Rule 12(c) Motion (Docket entries 69 and 70, which are the opinion and accompanying order on defendant's Rule 12(c) Motion), which is properly the subject of this appeal. A1. In deciding that motion, the district court explained expressly that "[t]he Court's claim construction ruling, which is being issued separately today, has no impact on Defendant's Rule 12(c) motion." A4 n.1. The judgment entered below, accordingly, did not incorporate the *Markman* Ruling.

For this reason, Google cannot, at this juncture, challenge the district court's claim construction. Where "a party's claim construction arguments do not affect the final judgment entered by the court, they are not reviewable." *SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1354

---

[9]   buySAFE does not see this differently: its opening brief did not so much as acknowledge that the district court engaged in claim construction.

(Fed. Cir. 2012). "An appeal is not an opportunity to bring before the appellate court every ruling with which one of the parties disagrees without regard to whether the ruling has in any way impacted the final judgment." *Mass. Inst. of Tech. & Elecs. For Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1350 (Fed. Cir. 2006) (declining to review a claim construction dispute that did not affect the judgment before the Court).

Google reserves its right to appeal from any subsequent judgment entered with respect to the *Markman* Ruling.

## CONCLUSION

The Court should affirm the judgment below.

Respectfully submitted,


/s/ Andrew J. Pincus
Andrew J. Pincus
Brian A. Rosenthal
Ann Marie Duffy
Paul W. Hughes
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-3000

A. John P. Mancini
Allison Levine Stillman
MAYER BROWN LLP
1675 Broadway
New York, NY 10019
(212) 506-2500

*Counsel for Defendant-Appellee Google Inc.*

Dated: December 9, 2013

# CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2013, I served the foregoing Brief for Defendant-Appellee Google Inc. on each party separately represented via the Court's electronic Pacer/ECF system.

Dated: December 9, 2013      /s/ Andrew J. Pincus    
                                 Andrew J. Pincus
                                 MAYER BROWN LLP

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned counsel certifies that this brief:

(i)      complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 12,013 words, including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(ii)      complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2007 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.


Dated: December 9, 2013          /s/ Andrew J. Pincus
                                 Andrew J. Pincus
                                 MAYER BROWN LLP